UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

DELTA AIR LINES, INC.,

                                  Plaintiffs,

              -against-

THE NEW YORK CITY DEPARTMENT OF
CONSUMER AFFAIRS and LORELEI SALAS, in her
official capacity as Commissioner of the NEW YORK
CITY DEPARTMENT OF CONSUMER AFFAIRS,

                                  Defendants.

Civil Action No.
17-cv-1343-ILG-RML

------------------------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

GEORGIA M. PESTANA
Acting Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
(212) 356-2215
(212) 356-2011


SHERYL NEUFELD
ANNETTE M. LALIC

Of Counsel.

September 27, 2019

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 2

FACTS ............................................................................................... 6

    A.  ESSTA Promotes Public Health…………………………………6

        1.  The Law guarantees New Yorkers the right to use paid sick leave without being subject to discipline or retaliation……….7

        2.  DCA's Enforcement Policy for Airlines Flight Crews gives Clear Guidance…………………………………………….9

    B.  Delta Speculates that compliance with the Law would cause unconstitutional burdens…………………………………………..10

        1.  Delta's leave policies require only minimal changes to comply to the Law…………………………………………………11

        2.  Delta has the resources to adapt to operational challenges without impacting services…………………………………..12

        3.  Delta relies on flawed and speculative analyses to conclude that minor changes to their sick leave policy to comply with ESSTA would cause a disruptive impact……………………13

        4.  Dr. Lee Adduces a Simple, but Misleading, Comparison of the Number of Sick Days Taken by Virgin Flight Attendants Before and After Compliance with the Law to Address the Link Between Compliance and Sick Time Taken by Flight Attendants…………………………………………………14

ARGUMENT ..................................................................................... 19

POINT I ............................................................................................. 20

NYC'S SICK LEAVE LAW IS NOT PREEMPTED BY THE AIRLINE DEREGULATION ACT BECAUSE IT DOES NOT BIND DELTA TO ANY PRICE ROUTE OR SERVICE EFFORTS

    1.  The ADA does not preempt employment regulations of general applicability unless their enforcement is "tantamount to a compulsion' over airline prices, routes or services………………20

2. The Law, as enforced, does not have a prohibited impact on air-carrier's prices, routes, or services…………………………………23

3. Underpinning Delta's arguments are speculative claims………...23

POINT II ............................................................................................................. 29

THE LAW IS A LEGITIMATE EXERCISE OF POLICE POWER UNDER THE DORMANT COMMERCE CLAUSE…………………...29

1. The Department's Enforcement Efforts Do Not Regulate Conduct Occurring Wholly Outside the State…………………………..30

POINT III ............................................................................................................ 39

THE DEPARTMENT'S ENFORCEMENT EFFORTS DO NOT VIOLATE ITS JURISDICTION UNDER STATE LAW……………….39

POINT IV .......................................................................................................... 21

T THE LAW AND REGULATORY GUIDANCE SUFFICIENTLY ADVISE PLAINTIFF AS TO HOW TO PROVIDE MANDATED SICK LEAVE TO ITS IN-FLIGHT CREW…………………………………41

1. Laws of Sufficient Clarity to Give a Reasonable Opportunity to Know What is Required or Prohibited are Not Vague…………..42

CONCLUSION.................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abdu-Brisson v. Delta Air Lines,
128 F.3d 77 (2d Cir. 1997)...................................................................20, 21, 27

Able v. United States,
88 F.3d 1280 (2d Cir. 1996).........................................................................31

Advance Pharm., Inc. v. United States,
391 F.3d 377 (2d Cir 2004)......................................................................40, 42

Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco,
992 F. Supp. 1149 (N.D. Cal. 1998) ..........................................................19, 20

Air Transp. Ass'n of Am. v. City and County of San Francisco,
266 F.3d 1064 (9th Cir. 2001) ........................................................................20

Allen v. Murray-Lazarus,
463 Fed. Appx. 14 (2d Cir. 2012)...................................................................17

Allied-Signal, Inc. v. Comm'r of Fin.,
79 N.Y.2d 73 (1991) ..................................................................................38

Aloha Islandair Inc. v. Tseu,
128 F.3d 1301 (9th Cir. 1997) .......................................................................20

Am. Airlines v. Wolens,
513 U.S. 219 (1995)....................................................................................18

Am. Beverage Ass'n v. Snyder,
735 F.3d 362 (6th Cir. 2013) (Sutton, J., concurring) ........................................30

Amerijet Int'l, Inc. v. Miami-Dade Cnty.,
627 F. App'x 744 (11th Cir. 2015) ................................................................20

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)....................................................................................17

Ass'n of Int'l Auto. Mfrs. v. Abrams,
84 F.3d 602 (1996)..................................................................................40, 42

Assn. for Accessible Medicines v. Frosh,
887 F.3d 664 (4th Cir. 2018) .........................................................................30

Bakalar v Lazar,
    71 Misc. 2d 683 (Sup. Ct. N.Y. Co. 1972) ............................................................38

Bakeer v. Nippon Cargo Airlines, Co.,
    2011 U.S. Dist. LEXIS 90102 (E.D.N.Y. July 25, 2011) ..................................38, 39

Bernstein v. Virgin Am., Inc.,
    227 F. Supp. 3d 1049 (W.D. Cal. 2017) .....................................................19, 26, 33

Bernstein v. Virgin Am., Inc.,
    227 F. Supp.3d at 1070–73 ..................................................................................25

Blackwell v. Skywest Airlines, Inc.,
    2008 U.S. Dist. LEXIS 97955 (S.D. Cal. Dec. 3, 2008).........................................25

Bostain v. Food Express, Inc.,
    153 P.3d 846 (Wash. 2007).........................................................................30, 31, 32

Botz v. Omni Air Int'l,
    286 F.3d 488 (8th Cir. 2002) ...............................................................................26

Boutilier v. INS,
    387 U.S. 118 (1967).............................................................................................40

Branche v. Airtran Airways, Inc.,
    342 F.3d 1248 (11th Cir. 2003) ...........................................................................20

Broadrick v. Oklahoma,
    413 U.S. 601 (1973)..............................................................................................41

by Michaud v Nippon Cargo Airlines, Co.,
    2011 US Dist. LEXIS 128705 9 (E.D.N.Y. Nov. 7, 2011)......................................38

Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,
    152 F.3d 1184 (9th Cir. 1998) .............................................................................20

Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,
    957 F. Supp. 1121 (N.D. Cal. 1997), aff'd 152 F.3d 1184 (9th Cir. 1998) ...........27

Casciani v. Nesbitt,
    659 F. Supp. 2d 427 (W.D.N.Y. 2009), aff'd 392 Fed. Appx. 887 (2d Cir.
    2010) ....................................................................................................................17

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..............................................................................................17

Cunningham v. Jet Aviation Flight Servs.,
    2013 U.S. Dist. LEXIS 58401 (D.N.J. Apr. 22, 2013) ....................................21, 27

Dan's City Used Cars, Inc. v. Pelkey,
    569 U.S. 251 (2013)...........................................................................................19

De Canas v. Bica,
    424 U.S. 351 (1976)...........................................................................................28

Delta Air Lines v. N.Y. State Div. of Human Rights,
    91 N.Y.2d 65 (1997)..........................................................................................20

DiFiore v. Am. Airlines, Inc.,
    646 F.3d 81 (1st Cir. 2011)................................................................................20

Dilts v. Penske Logistics, LLC,
    769 F.3d 637 (9th Cir. 2014) .................................................................19, 25, 27

Filo Foods, LLC v. City of SeaTac,
    357 P.3d 1040 (Wash. 2015).........................................................................20, 26

Freedom Holdings, Inc. v. Spitzer,
    357 F.3d 205 (2d Cir. 2004).........................................................................28, 29, 33

Gary v. Air Group, Inc.,
    397 F.3d 183 (3d Cir. 2005)..............................................................................20

Grayned v. City of Rockford,
    408 U.S. 104 (1972)......................................................................................40, 41

Hawaiian Airlines v. Norris,
    512 U.S. 246 (1994)...........................................................................................20

Healy v Beer Inst.,
    491 U.S. 324 (1989)...........................................................................................29

Hoffman v. Parade Publs.,
    15 N.Y.3d 285 (2010)........................................................................................38

Instructional Sys., Inc. v. Computer Curriculum Corp.,
    35 F.3d 813 (3d Cir. 1994)................................................................................29

Jones v. Schneiderman,
    974 F. Supp. 2d 322 (S.D.N.Y. 2013)...............................................................29

Maine v. Taylor,
    477 U.S. 131 (1986)...........................................................................................28

Marchi v. Bd. of Coop. Educ. Servs. of Albany,
    173 F.3d 469 (2d Cir. 1999)..............................................................................42

Mass. Delivery Ass'n v. Coakley,
        671 F.3d 33 (1st Cir. 2012)...................................................................19

Mass. Delivery Ass'n v. Coakley,
        769 F.3d 11 (1st Cir. 2014)...................................................................21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
        475 U.S. 574 (1986)...........................................................................17

Mendis v Schneider Nat'l Carriers Inc.,
        2016 U.S. Dist. LEXIS 156695 (W.D. Wash Nov. 10, 2016) ..............31, 32, 36, 37

Minnesota v. Cloverleaf Creamery, Inc.,
        449 U.S. 456 (1981)...........................................................................35

Morales v. TWA,
        504 U.S. 374 (1992)......................................................................18, 19

N.Y. Pet Welfare Ass'n v. City of New York,
        850 F.3d 79 (2d Cir. 2017)...................................................................35

New Energy Co. v. Limbach,
        486 U.S. 269 (1988)...........................................................................28

Norfolk Southern Corp. v. Oberly,
        822 F.2d 388 (3d Cir. 1987)..................................................................34

Papachristou v. City of Jacksonville,
        405 U.S. 156 (1972)...........................................................................40

Parise v. Delta Airlines, Inc.,
        141 F.3d 1463 (11th Cir. 1998) .............................................................20

Pharm. Research & Mfrs. of Am. v. Walsh,
        538 U.S. 644 (2003)...........................................................................30

Pike v. Bruce Church Inc.,
        397 U.S. 137 (1970)...................................................................34, 35, 37

Quaratino v. Tiffany & Co.,
        71 F.3d 58 (2d Cir. 1995) .....................................................................17

S.D. Myers, Inc. v City & County of San Francisco,
        253 F.3d 461 (9th Cir 2001) .............................................................31, 33

SPGGC, LLC v. Blumenthal,
        505 F.3d 183 (2d Cir. 2007)..................................................................28

Stone v. Frontier Airlines, Inc. (In re Estate of Stone),
256 F. Supp. 2d 28 (D. Mass 2002) ...................................................32

Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.,
03-Civ-1414 (MP), 2003 U.S. Dist. LEXIS 22655 (S.D.N.Y. 2003) ......................................17

Textile Workers Pension Fund v Std. Dye & Finishing Co.,
725 F.2d 843 (2d Cir. 1984)...................................................41

Thompson v U.S. Airways, Inc.,
717 F. Supp. 2d 468 (E.D. Pa. 2010) ...................................................20

Tobin v Fed. Express Corp.,
775 F.3d 448 (1st Cir 2014)...................................................18

Ulysse v. AAR Aircraft Component Servs.,
841 F. Supp. 2d 659 (E.D.N.Y. 2011) ...................................................20

United States v. Schneiderman,
968 F.2d 1564 (2d Cir. 1992), cert. denied, 507 U.S. 921 (1993) ...........................................41

Ventress v. Japan Airlines,
603 F.3d 676 (9th Cir. 2010) ...................................................20

Weinstock v. Columbia Univ.,
224 F.3d 33 (2d Cir. 2000), cert. denied, 540 U.S. 811 (2003) ...............................................17

Wellons v. Northwest Airlines, Inc.,
165 F.3d 493 (6th Cir. 1999) ...................................................20

**Statutes**

49 U.S.C. 40101, *et seq*...................................................18

49 U.S.C. § 14501(c)(1)...................................................19

49 U.S.C. § 41713(b)(1) ...................................................4, 18

ADA ...................................................*passim*

Airline Deregulation Act...................................................4

Airline Deregulation Act of 1978 ...................................................18

code 09G ...................................................11, 13

Code 20-919 ...................................................14

code 67 ...................................................11

Code § 20-911(f) ...................................................................................................8

Code § 20-912 .........................................................................................31, 33, 41

Code § 20-913(b) ......................................................................................6, 36, 37, 42

Code § 20-913(b)(2)(c) ..........................................................................................7

Code § 20-914(a)(1) ..............................................................................................42

Code §§ 20-914(a)(2), 20-914(b)(2), 20-914(d) .....................................................7

Code § 20-914(c) ...................................................................................................42

Code § 20-919 ...................................................................................................14, 16

Earned Sick Time Act .............................................................................................2

Federal Aviation Administration Authorization Act ..............................................19

N.Y.C. Human Rights Law ......................................................................................39

New York City Earned Safe and Sick Time Act ................................................8, 42

New York City Human Rights Law .........................................................................38

Paid Safe and Sick Leave Law ...............................................................................42

**Other Authorities**

6 RCNY §7-205(b) ...................................................................................................7

6 RCNY § 7-215 ......................................................................................................7

Delta's "Well-Call" ................................................................................................15

Fed. R. Civ. P. 56(a) ..............................................................................................17

New York State Constitution ..........................................................................5, 38, 39

U.S. Const. Art. I, § 8, cl. 3 ...................................................................................28

U.S. Constitution ....................................................................................................38

Defendants City of New York Department of Consumer Affairs ("DCA") and Lorelei Salas, as Commissioner of DCA, submit this memorandum of law in opposition to Plaintiff's motion for summary judgment ("Pl. SJ Mot."), and in support of Defendants' cross-motion for summary judgment.

## I.   <u>INTRODUCTION</u>

In 2014, the New York City Council passed the Earned Safe and Sick Time Act (also known as "ESSTA", or the "Law")[1] to protect New Yorkers from the spread of illness and disease, among other reasons, by guaranteeing that employees can use paid sick leave without fear of discipline or retaliation. Without the right to paid sick leave, employees have to choose between addressing their health needs or facing the economic consequences of lost income and retaliation from their employer. These concerns cause many employees to disregard the consistent recommendation of medical professionals to stay home while sick, and force them to return to work spreading illness along their commute and into the workplace.

Flights attendants provide the perfect example of the significant benefits that the Law was designed to achieve for both employee welfare and public health. With their demanding responsibilities and regular travel, flight attendants confront particularly heightened health risks due to the nature of their job. They are regularly exposed to factors that make them susceptible to illness, including irregular work schedules, interrupted sleep patterns, confined working quarters, continual close contact with passengers, an environment of recirculated air, and the considerable responsibility to act in an emergency. Additionally, because of this high degree of personal

---

[1] Local Law 199/2017 amended the Earned Sick Time Act as the Earned Safe and Sick Leave Law, effective on May 5, 2018, allowing employees covered under the Law to paid their paid leave if they or a family member have been use their paid leave if they or a family member have been the victim of any act or threat of domestic violence, unwanted sexual contact, stalking, or human trafficking in order to obtain services, consult with an attorney, or take certain other steps to focus on their safety without fear of retribution.

contact, studies have estimated that a sick flight attendant is 6.6 times more likely than a sick passenger to infect someone else on a flight.[2]  These stark health consequences are complicated further by employment policies that discipline flight attendants for calling out sick. By ensuring that airlines provide sufficient sick leave to flight attendants that work out of New York, the Law ensures that covered flight attendants flying into or out of New York City never have to put passengers at risk of infection due to fear of retribution or lost income.

Unfortunately, Delta Air Lines ("Delta" or "the Plaintiff") does not fully appreciate these significant benefits. Although Delta argues that it provides a 'more generous' leave policy than the Law requires, Delta does not adhere to several of the Law's key components that would involve minimal changes to their existing leave policy in order to comply. Most notably, Delta's disciplinary policy provides for progressive discipline against flight attendants who take unscheduled sick leave in instances in which notice is not practicable within their required three hour notice requirement. Additionally, Delta can require medical documentation for any amount of sick leave taken by a flight attendant. The threat of discipline undermines the Law's objectives by causing a particularly vulnerable group of employees to suffer through illness, and unnecessarily expose the public to the resulting health consequences.

ESSTA balances sick leave protections with the employer's ability to manage their business. The Law applies only to the first forty hours of any type of leave in a calendar year, and any subsequent leave accrual and use remains unfettered by the Law's protections. Although medical documentation is prohibited for sick leave less than three executive days, an employer is

---

[2] Declaration of Daniel W. Akins (Akins Decl.) Ex. 1 (the Expert Report of Daniel W. Akins executed November 30, 2018 (Akins Expert Report)) at 35 (citing to Citing to Hertzberg, et al., Behaviors,  movements and transmissions of droplet-mediated respiratory diseases during transcontinental airline flights, 2/13/2018, Proceedings of the National Academy of Sciences of the United States of America, www.pnas.org/cgi/doi/10.1073/pnas.1711611115 ) .

allowed to request verification that an employee's leave was for ESSTA permitted purposes at any time. Finally, for unforeseeable sick leave absences, an employer is permitted to require employee notice as soon as practicable given the particular circumstances of the employee's needs.  Finally, in instances where an employee is found to have abused their sick leave under the Law, an employer is permitted to take disciplinary action.

Delta fails to account for the Law's flexibility, and instead offers conclusory statements that compliance would lead to untenable increases in sick leave use, increased flight delays, and such significant costs that it would be forced to cancel routes and raise fares.  Its narrative not only departs from the factual requirements of the Law but also overstates the Law's burdens by ignoring the existing constraints in which Delta already successfully operates.

Delta argues that its New York-based flight attendants should not receive the same benefits under the Law enjoyed by employees throughout New York City. Delta advances four causes of action, arguing that providing its covered flight attendants with the benefits afforded by the Law is preempted by federal law, impermissibly and also burdens interstate commerce, that the Department is overstepping its jurisdiction by applying the Law extraterritorially, and that the Law is impermissibly vague in this application.

All of these arguments fail. Plaintiff's federal preemption claim is predicated on the Airline Deregulation Act, which provides that local governments "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The Department's enforcement actions do not have a significant impact Delta's prices, routes, or services. Although Delta alleges that the Law will cause significant operational disruptions due to grounded or delayed flights, it fails to provide anything beyond speculation, and conclusory self-serving statements.

Nor does the law unconstitutionally burden interstate commerce. The 'dormant' Commerce Clause doctrine limits states (and municipalities) from imposing regulations that favor in-state interests over out-of-state interests. Because Delta cannot demonstrate that the Law burdens out-of-state air carriers more than in-state air carriers—if anything, the opposite is true—they cannot make out a commerce clause claim. Nor can Delta demonstrate that the burden on interstate commerce, which, as noted above, is relatively minor, if any, is clearly excessive to the significant local benefits of the Law. Finally, Plaintiff's claim that the Department is regulating extraterritorially is inaccurate, since the Department's enforcement actions are restricted to flight attendants who are based in New York City, and only provides sick-leave benefits for flights departing from or arriving in New York. For this same reason, Plaintiff's third cause of action that the Department is regulating extraterritorially in violation of the New York State Constitution also fails.

Finally, the Law and the Department's regulatory guidance provide clear guidelines to regulated air carriers on how to comply with the Law. Under the Law, employees must work 80 hours in a calendar year within New York City to be covered; the Department applies a rebuttable presumption that New York City-based flight attendants are covered under the Law. Flight attendants (like all other employees covered under the Law) accrue one hour of paid sick leave per 30 hours worked, regardless of jurisdiction, and can use their accrued leave on any flight departing from or arriving in New York. This means that Delta does not need to track the hours worked by flight attendants in each jurisdiction, obviating a major basis for their Commerce Clause and extraterritoriality claims. Further, the clear enforcement guidelines are more than sufficient to overcome Plaintiff's vagueness claim.

## II. __FACTS__

### A. __ESSTA Promotes Public Health__

In establishing ESSTA, the New York City Council recognized that an employee should have the right to take sick leave without compromising their economic security or being subject to discipline or retaliation from their employer. See Local Rule 56.1 Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ("SOF") at ¶ 1. Securing an employee's right to sick leave promotes "the public health of the City," "foster[s] employee retention and productivity," and protects the public from unnecessary exposure to and spread of disease. SOF"at ¶ 2.

Permissible use of sick time under the Law includes use for an employee's, or someone the employee considers a family member's, mental or physical illness, injury or health condition, the need for diagnosis, care, or treatment, and preventive medical care. Id. § 20-914(a)(1). Additionally, the Law permits for safe leave for employees, or to assist those considered family members of employees, who are victims of a family offense matter, sexual offense, stalking, or human trafficking to take steps to provide for their own security and that of their family.

DCA takes ESSTA enforcement and resulting violations seriously, especially in public-facing industries in which the risk for exposure to and spread of communicable disease is significant, such as food service, healthcare, and especially transportation services. SOF" at ¶ 2. There are few occupations that exemplify the individual and public health concerns underlying sick leave as clearly as flight attendants. Indeed, flight attendants by the nature of their work are in a unique position to not only be exposed to, but broadly transmit illness and disease. SOF" at ¶ 52 .

**1. The Law guarantees New Yorkers the right to use paid sick leave without being subject to discipline or retaliation.**

To achieve its public health objectives, ESSTA provides for employees to earn up to forty hours of protected sick time per calendar year that are subject to specific legal protections. Admin. Code §§ 20-913; SOF at ¶¶ 7, 10, 16, 18.  .  ESSTA restricts employers' ability to penalize employees for use of protected leave—the first forty hours of leave available—for sick leave purposes. Admin. Code § 20-918; SOF at ¶ 5, 7. This prohibition applies to disciplinary "point" systems, such as those which assign points or other adverse consequences on account of an employee's absence. SOF" at ¶ 7. Thus, a system in which an employee accrues points towards disciplinary action for each use of protected sick time is impermissible. Id.; see 6 RCNY § 7-108; SOF at ¶ 9, 41. However, a policy that disciplines an employee for absences after the first forty hours of sick leave use is permissible under the law. SOF at ¶ 42. Although employers must provide at least forty hours subject to these protections, employers that already provide forty hours of general paid time off ("PTO")[3] need not provide any additional sick time under the Law as long as the first forty hours of PTO can be used in accordance with ESSTA requirements. 6 RCNY §7-211(c)(4); SOF at ¶ 6.

Further, an employee can still be held responsible for abusing protected sick leave. SOF at ¶¶ 10, 11. Under ESSTA, an employer can "take disciplinary action, up to and including termination, against an employee who uses safe time or sick time provided under [ESSTA] for purposes other than [permitted under the law]." 6 RCNY § 7-215; SOF at ¶ 10.  Indications of abuse of safe and sick time can include, but are not limited to, a pattern of "(1) use of unscheduled safe time and sick time on or adjacent to weekends, regularly scheduled days off, holidays, vacation or pay day, (2) taking scheduled safe time and sick time on days when other

---

[3] Examples of PTO include paid vacation, paid personal time, or flexible pay time.

leave has been denied, and (3) taking safe time and sick time on days when the employee is scheduled to work a shift or perform duties perceived as undesirable." SOF at ¶ 11. #. Thus, ESSTA affords employers recourse for any actual abuse of protected sick time.

Although an employer may not require an employee to provide documentation from a healthcare provider for three or fewer consecutive work days of sick time use, they can require employees to submit written verification that their sick time use was for a purpose authorized under ESSTA. Admin. Code §§ 20-914(a)(2), 20-914(b)(2), 20-914(d); SOF at ¶ 18.

ESSTA limits the amount advance notice employers may require for employees' use of sick time. Admin. Code § 20-913(b)(2)(c); 6 RCNY §7-205(b); SOF at ¶ ¶12, 13, 14. For foreseeable uses of sick time, such as a pre-scheduled surgery, an employer may require the employee to provide them with up to, but no more than, seven days' advance notice of the need to use sick time. SOF at ¶ 13. For unforeseeable uses of sick time, such as a sudden illness, employees need only provide notice to their employer as soon as practicable[4] under the circumstances. SOF at ¶ 14.

However, the Law does not prohibit an employer from taking sensible steps to manage the impact of an absent employee. SOF" at ¶ 16. The Law does not prohibit an employer from calling or otherwise contacting an employee that fails to appear at the appointed time to determine whether they are late, or whether they intend to use sick leave. SOF at ¶ 16. Additionally, there is no prohibition on employer's requiring advance check in, or creating reasonable notice requirements provided notice is not required too far in advance. See 6 RCNY §7-205(b).

---

[4] An employer may not dictate what they deem to be a universally-reasonable amount of advance-notice for unforeseeable use of sick time. Since the health related event is unforeseeable, the amount of notice provided to the employer is based on the facts and circumstances of the event. SOF" at ¶ #.

## 2. DCA's Enforcement Policy for Airlines Flight Crews gives Clear Guidance.

The Department has provided industry-specific guidance as to how flight crew employers can comply with the Law in its "DCA Enforcement Policy: Airline Flight Crew under the New York City Earned Safe and Sick Time Act" (the "enforcement policy"). Declaration of Annette M. Lalic ("Lalic Decl.) Ex. B (Department of Consumer Affairs Enforcement Guidelines for Airline Crews (enforcement policy)) at 1).SOF at ¶ 25.

As any other New York City employee, a flight attendant is entitled to ESSTA's protections upon exceeding eighty hours of work within the City of New York in a calendar year. See Admin. Code § 20-911(f). SOF at ¶ 25; Employees meeting this threshold are covered regardless of where they live. Admin. Code § 20-911(f). SOF at ¶ 27. Flight attendants who live outside of New York City, like the millions of workers who commute into New York City from New Jersey, Connecticut, Pennsylvania, and other parts of New York state, are covered upon meeting the eighty-hour threshold. Id.

The enforcement policy provides examples of work that flight attendants perform that count towards the eighty-hour threshold. SOF at ¶ 34. These include "the time worked before take-off on flights departing from a New York City airport and after landing for flights arriving to a New York City airport." Id. The examples provided, however, do not constitute an exhaustive list of the types of work that count towards the eighty-hour threshold. Id. Rather, the enforcement policy clarifies that such work is generally "includ[ed]" in the hours "the employee worked while physically present in New York City." This indicates that other types of work performed while physically located in New York City would also count towards the threshold. Id. (emphasis added). A flight attendant's time spent waiting on standby in New York City,

either in the airport itself or within the city limits, also counts towards the Law's eighty-hour threshold. Id.

The Department applies a rebuttable presumption that flight attendants based in New York City meet the eighty-hour threshold. SOF at ¶ 28-30. Employers may rebut this presumption by providing documents showing that a New York City-based FA did not, in fact, work eighty hours in New York City. Id.

The enforcement policy requires employers to allow employees to use protected leave for, at minimum, any flight originating or ending in New York City. Id.   Additionally, recognizing that flight attendants that absent themselves are unable to join a flight once it has taken off, has permitted employers to use a minimum increment for flight attendant use of sick time equal to the actual duration of the missed flight up to a maximum of eight hours. For flights that lasting fewer than four hours, employers can still apply a four hour minimum increment. SOF at ¶ 39.

### B.  Delta Speculates that compliance with the Law would cause unconstitutional burdens

Delta's leave policy meets or exceeds the requirements of ESSTA in many ways, but departs from ESSTA's requirements in several key aspects that impede the Law's main objectives of promoting public health and individual well-being. SOF at ¶ 110, 112.  Delta alleges that the Law's notice requirements for use of sick leave, its restriction from assessing disciplinary points to ESSTA protected leave, and its inability to require medical documentation places an insurmountable burden on its operations. SOF at ¶ 113, 114. However, Delta bases these assertions on a misunderstanding of the Law's requirements, failing to consider the methods provided and allowed by the Law to still hold employees accountable, and a series of flawed analyses. SOF at ¶ 115-172.

**1. Delta's leave policies require only minimal changes to comply to the Law.**

Delta provides its flight attendants up to fifty-six hours of Paid Personal Time ("PPT") per year.  SOF at 95. PPT can be used for any type of absence but is still subject to the Professional Development Program ("PDP"). SOF at ¶ 103.  PDP assesses points to flight attendants for violations of its leave policy. Id. When a certain number of points are accrued, a flight attendant is subject to several levels of discipline ranging from verbal warnings to termination. SOF at ¶ 104.  Although PDP confers points for a variety of conduct and absences, the Law only prohibits points assessed for use of the first forty hours of sick leave. SOF at ¶ 140.

Delta provides flight attendants with four unscheduled absences within a rolling twelve-month period before a flight attendant may, at Delta's discretion, be subjected to informal verbal coaching. SOF at ¶ 105.  A single absence is a 'trip' and can constitute various amounts of leave hours depending on the destination. SOF at ¶ 108.  Delta has not provided data to suggest how many flight attendants use all or a portion of these unscheduled absences, nor have they provided an analysis of the operational impact, if any, on reserves, delays, or other services due to the additional unscheduled absence. SOF at ¶ 109.

Presumably, Delta does not want flight attendants flying sick. Sickness is not always a foreseeable event. In those instances, ESSTA provides that flight attendants can provide notice to Delta as soon as practicable.  SOF at ¶ 14-15. In turn, the Law does not limit Delta's potential use of mechanisms that mitigate the impact of a late or otherwise absent flight attendant. SOF at ¶ 16-17.  An employer is allowed to call or otherwise contact an employee that fails to arrive at the appointed time to inquire whether they are late, or in need of safe or sick time leave. Id.  If a flight attendant indicates that leave is needed, fails to be reached by phone, or fails to appear for report time, Delta is then able to mobilize another pool of employees to find a replacement. Id. ;

SOF ¶ 52. In situations in which a flight attendant may suddenly fall ill at the gate before departure, ESSTA ensures that the flight attendant is not pressured into flying sick, or assessed disciplinary points for sick leave. Id.

### 2. Delta has the resources to adapt to operational challenges without impacting services.

Delta Airlines uses the term "Daily Operations" to refer to the normal day-to-day running of the airline, including rerouting of scheduled pairings as a result of mechanical, weather, crew and other causes of delays and cancellations. SOF ¶ 57. Indeed, flight delays and cancellations are a regular part of Delta's operational challenges. SOF ¶ 58. Delta has systems in place to observe, and react to operational issues that may arise in order to contain and alleviate any service disruptions. Delta's 23,613 active flight attendants, of which 4,343 flight attendants based in the New York region, are sent to wherever they are needed. SOF ¶ 80.

Delta Crew Tracking is responsible for monitoring all operating pilot and flight attendant rotations for illegalities and operational disruptions. SOF ¶ 81. They will reroute affected and unaffected flight attendants to repair rotations that are disrupted by cancellations, delay or misconnecting flights. SOF ¶ 83. Delta employs a variety of staffing tools to make sure that flight attendants are accessible when needed.  SOF ¶ 84. Flight attendants can be drafted, meaning they are involuntarily reassigned from one rotation to fly a required FAA-minimum position on another rotation. SOF ¶ 84. Flight attendants can also be reassigned to another terminal, or flown into their 'off-duty' time if critical staffing necessitates. SOF ¶ 84. Additionally, during "Severe Operations"[5] flight attendants are put on a mandatory availability status, and Crew Tracking utilizes flight attendant crews to avoid flight cancellations.

---

[5] Severe Operations are a set of operating conditions and associated rules that may be put into effect when extraordinary circumstances, such as severe weather or airport closures, have substantially affected operations of flights and services.

Flight attendants are also assigned ready access days or A-Days that are designed to cover the operational requirements of a base.  SOF ¶ 64. When a flight attendant is on call as an A-Day, they must respond to scheduling or acknowledge through Crew Notification ("CNO") within twenty minutes of the first contact attempt. SOF ¶ 70.  Additionally, flight attendants are assigned airport standby in which they are required to be at the airport ready to fly in case needed. SOF ¶ 76. If a flight attendant leaves the lounge area for any reason when on airport standby duty, they must ensure that a scheduler or duty desk manager is aware of their location and how to contact them. SOF ¶ 77. Additionally, when on A-Days, flight attendants may be assigned to "out-of-base standby," meaning they are assigned to sit standby at another base location. SOF ¶ 78.

> **3. Delta relies on flawed and speculative analyses to conclude that minor changes to their sick leave policy to comply with ESSTA would cause a disruptive impact.**

> **i. The Impact of Flight Attendant Sick Days on Flight Delays**

Delta relies on Dr. Darin Lee's analyses to support the proposition that increased sick days among flight attendants leads to increased flight delays.  SOF at ¶ 116.  Dr. Lee uses a model in which he compares the 25% sickest days as compared to the bottom 75% ("25% sickest day model"), in his combination with his analysis of the effect of the Law on additional sick time taken.  Id.  However, there are several fundamental flaws in this model and the data does not support the conclusions. SOF at ¶ 117-125.

Dr. Lee makes no analysis of the expected effect of ESSTA compliance on flight attendance sick use. SOF at ¶ 117. Instead, the model he sets forth at best would provide an estimate of the effect on flight delays when Delta has one of their worst days (top 25%) in terms of having flight attendants call in sick. SOF at ¶ 118.

Further, Dr. Lee uses a set of regressions to estimate the singular effect of flight attendant sick days on flight delays at Delta, all else equal. SOF at ¶ 116. However, the dependent variable in these regressions is total delay rate instead of Cabin Crew Shortage delays. Id. In other words, while the regression analysis of Cabin Crew Shortage delay data were available and demonstrate no increase in flight delays, Dr. Lee performed a second set of regressions to look at whether there were more delays not necessarily coded as related to Cabin Crew Shortage on days with higher numbers of flight attendants calling in sick. SOF ¶ 118.

Additionally, Dr. Lee treats the top 25% of sick days as a dummy or binary variable. SOF at ¶ 120. He fails to look at this relationship more precisely by using a variable reflecting the actual number of people who call in sick.  Id.  This is significant because it is more likely that a small number of flight attendants calling in sick can be covered by on duty or on call reserves. Id.

Even so, Dr. Lee's analysis shows that the increase in flight delay rates resulting from the bottom 75% to the top 25% of days in terms of flight attendants calling in sick was a 1.6% increase in the probability of a flight being delayed. SOF at ¶ 120. This means that on the highest 25% of sick days, a flight has an increased chance of delay at 1.6%. SOF at ¶ 125. Setting aside the aforementioned flaws, Dr. Lee makes no analysis of whether these results are practically significant on airline operations or passenger impact including perceived satisfaction with their flight. Id.

> **4. Dr. Lee Adduces a Simple, but Misleading, Comparison of the Number of Sick Days Taken by Virgin Flight Attendants Before and After Compliance with the Law to Address the Link Between Compliance and Sick Time Taken by Flight Attendants**

Dr. Lee asserts through analysis and regressions that Virgin America's (Virgin') alleged compliance with ESSTA placed such a significant burden on operations due to flight delay and

cancellations[6] that it closed its JFK flight attendant base. SOF at ¶ #. However, Dr. Lee's flight delay data appears to be inconsistent with his opinion. SOF at ¶ #.

As an initial but critical matter, limited evidence of Virgin's compliance with the Law has been presented, and the aspects that were specifically described, albeit in conclusory terms, were incongruent with what the Law requires. SOF at ¶ #. Dr. Lee relies solely on the conclusory, unsupported Declaration of Jeff Butler ("Butler Declaration"), the former Vice President Airports, Inflight, and Customer Service at Virgin America, that was produced as part of the litigation in another case[7] to assess Virgin's compliance with ESSTA. SOF at ¶ #126. Dr. Lee never had conversation with Butler, and never asked him his basis of knowledge for the conclusory statements in his declaration regarding Virgin's compliance or eventual closure of the JFK flight attendant base. SOF at ¶ 128-30. And further, Dr. Lee did not perform any independent research into the facts provided in the Butler Declaration other than when he "review[ed] the work rules in detail." SOF at ¶ 131.  .

It is unclear to what degree Virgin complied with ESSTA. SOF at ¶ 126. In the Butler declaration, it states that Virgin adjusted their progressive discipline policy to prohibit the application of points for FAs' first forty hours of sick leave use, and then failed to adjust their progressive point system for the remaining leave. SOF at ¶ 141. Flight attendants received nine

---

[6] Although Dr. Lee concludes that cancellations (not simply delays) were one of the burdens that ultimately led to Virgin's JFK Flight Attendant base closure, he performed no regressions as to Virgin's cancelled flights. SOF at ¶ #. The number of these flight cancellations is 0.03% of flights, and less than 3% of all flight cancellations in this time. Id. SOF at ¶ #.

[7] The plaintiffs in the case of <u>Air Transport Association of America, d/b/a Airlines for America, Inc. v. The Washington Department of Labor & Industries et al.</u>, United States District Court, Western District of Washington at Tacoma, No. 3:18-cv-05092, provided the declaration of Jeff Butler to argue against implementation of a analogous sick and safe time law in Washington State. At the time of the Declaration, Jeff Butler worked for Alaska Airlines, the plaintiff in the Washington Case.

additional days before discipline could be applied. Id.  This resulted in a policy considerably more generous than what is required by the Law. Id.

Virgin's lack of compliance[8] with ESSTA calls into question any statistical analysis or conclusions that come from its JFK flight attendant base. SOF at ¶¶ 140-42. However, even setting that aside, Dr. Lee performed a regression analysis that indicates that in the two years following compliance with the Law, Virgin saw an increase in the percentage of Cabin Crew Shortage delays of 0.16% of flights out of JFK.  Dr. Lee's regression coefficient of a 0.16% increase in the probability of a Cabin Crew Shortage delay in the first two years after compliance is not statistically significant at the 95% or 99% level. SOF at ¶¶ 148-151.  This means that Dr. Lee's regression showed that two years after alleged compliance, Virgin experienced a 41% and 99% increase in sick time taken by flight attendants at JFK. Id. However, there was no statistically significant increase in Cabin Crew Flight delays at JFK during this time. Id.  The data show that there is no distinguishable and reliable effect and suggests that Virgin America's reserve flight attendant staffing model worked as expected by absorbing flight attendant absences. Id.

Dr. Lee's regression analysis indicates that the cabin crew delay rate spiked in the final seven months before Virgin closed its JFK flight attendant base.  SOF at ¶ 151.  Dr. Lee provides no credible reason to link this to the Law. SOF at ¶ 154. Dr. Lee concluded, with no cited sources, that the reason for the increase was a sudden realization, two years after Virgin's compliance, that there would be no penalty for flight attendants use of sick time. Id. This two-

---

[8] As required by Admin. Code § 20-919, there is no record as to whether Virgin distributed a Notice of Rights to employees. SOF at 135. A Notice of Rights informs all ESSTA covered employees of what kind of leave ESSTA protects, the notice requirements for that leave, legal protections applied to that leave, and recourse if an employer violates ESSTA protected leave. Id. Employers are required to keep a record of the Notice of Rights distribution to employees as well as proof of receipt. As such, it is unclear what, if anything Virgin flight attendants knew about ESSTA leave. SOF at ¶.

year-later epiphany theory directly contradicts Dr. Lee's own analysis and opinion that flight attendants are extremely aware of, and change their behavior in response to, changes in rules that affect flight attendants and their sick time, and contradicts his other assertions on how flight attendants react. [9]

Dr. Lee never performed any independent investigation surrounding Virgin's closure of its JFK flight attendant base. SOF ¶ 161. In public articles released after Virgin's merger with Alaska, often there were reports were integration challenges, cultural differences, a need to evolve, and nearly two-thirds of executives thought that culture integration was the top challenge they faced. SOF at ¶ 172. Further, in late March of 2017, just a few weeks before the increase of sick leave that Dr. Lee described, Richard Branson, the Virgin founder, notified employees via an internal blog post communication that Alaska Airlines was eliminating the Virgin brand. SOF at ¶ 173. Branson stated that some people at Virgin were calling that day "the day the music died." Id.

In February 2016, Oliver Wyman—an outside firm retained by Virgin in the ordinary course of business—recommended that Virgin close its JFK flight attendant base because of its uneconomically small, stranded base challenges. SOF at ¶ 171. There was no mention of Virgin's inability to comply with ESSTA, but instead, it was cited that Virgin did not analyze the economics of the JFK base before opening it. SOF at ¶ 170.

---

[9] Dr. Lee argues that Delta's "Well-Call" data supports his proposition in the Virgin example that flight attendants are reactive to changes in policy regarding their leave and scheduling. SOF at ¶ 156. A Well-Call is when a flight attendant calls in "well" after having notified Delta that he or she was sick. Before the policy change a flight attendant that had called out sick could call in well during the remainder of their rotation, and then at their discretion pick up a rotation to possibly earn a premium payment for their work. Id. Following the policy change, a flight attendant who called in well would be marked available and could be assigned a call at Delta's discretion. Dr. Lee uses the Well Call data in which flight attendant behavior changed within the month of the policy to support his assertion of the two-year epiphany for Virgin (in which he contends that it took flight attendants nearly two years to react to policy change).

Although Dr. Lee concludes that cancellations, not simply delays, were one of the burdens that ultimately led to Virgin's JFK Flight Attendant base closure, he performed no regressions as to Virgin's cancelled flights. SOF at ¶ 168-169. The number of these flight cancellations is 0.03% of flights, and less than 3% of all flight cancellations in this time. Id. With an average of 11.75 flights per day, Virgin America had approximately 13,000 flights in the time period from April 1, 2015 through April 30, 2018. There were only four Cabin Crew Shortage cancellations in just over three years or 0.03% of all flights were cancelled due to Cabin Crew Shortages. Id. From April 1, 2015 through October 31, 2017 there were three Cabin Crew Shortages cancellations out of 103 total cancellations for 11,099 flights. Moreover, as previously states, the code for Cabin Crew Shortages accounts for shortages beyond just flight attendant sickness. Id.

Dr. Lee asserts that Virgin's compliance with ESSTA at its JFK flight attendant base did not cause Virgin to close its JFK base. Rather, he relies on the Butler Declaration that states that the "adverse operational effects, high administrative burdens, and significant increase in overhead resulting from [ESSTA] compliance contributed significantly to Virgin America's decision to close its base." Dr. Lee never asked Butler if there could have been any other causes than ESSTA compliance to the increase of sick leave at the JFK flight attendant base. Dr. Lee does not know what other factors contributed to the decision to close the Virgin JFK flight attendant base, but concludes that based on his analysis it is clear that operation reliability and cost issues driven by ESSTA weighed heavily into the decision.

III. <u>ARGUMENT</u>

1. **Legal Standard.**

Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 248 (1986).

Although the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion, <u>Quaratino v. Tiffany & Co.,</u> 71 F.3d 58, 64 (2d Cir. 1995), "this standard does not simply require the court to draw <u>all</u> inferences in the non-movant's favor, but [only] all <u>reasonable</u> inferences."  <u>Casciani v. Nesbitt,</u> 659 F. Supp. 2d 427, 434 (W.D.N.Y. 2009), <em>aff'd</em> 392 Fed. Appx. 887 (2d Cir. 2010) (emphasis added).   In determining whether an inference is reasonable, the Court "need not…credit unsupported factual allegations and innuendos."  <u>Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.,</u> 03-Civ-1414 (MP), 2003 U.S. Dist. LEXIS 22655, at *2 (S.D.N.Y. 2003), <u>citing Azurite Corp., Ltd. v. Amster & Co.,</u> 844 F. Supp. 929, 936 (S.D.N.Y. 1994).

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 586 (1986); <u>Weinstock v. Columbia Univ.</u><em>,</em> 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment "[t]he time has come . . . 'to put up or shut up.'" (citations omitted)), <u>cert. denied</u>, 540 U.S. 811 (2003). "Conclusory allegations, conjecture and speculation … are insufficient to create a genuine issue of fact" and defeat summary judgment.  <u>Allen v. Murray-Lazarus</u>, 463 Fed. Appx. 14, 16 (2d Cir. 2012) (citation omitted).

**POINT I**

**NYC'S SICK LEAVE LAW IS NOT PREEMPTED BY THE AIRLINE DEREGULATION ACT BECAUSE IT DOES NOT BIND DELTA TO ANY PRICE ROUTE OR SERVICE EFFORTS**

The Airline Deregulation Act of 1978 (the "ADA") grants states and localities wide leeway to regulate air carriers under generally-applicable local laws, including employment regulations. This case falls squarely within that established precedent.

    **1.  The ADA does not preempt employment regulations of general applicability unless their enforcement is "tantamount to a compulsion' over airline prices, routes or services.**

The ADA deregulated the airline industry, removing federal control over such areas as routes, fares, and market entry. 49 U.S.C. 40101, *et seq*. It included an express preemption provision "[t]o ensure that the States would not undo federal deregulation with regulation of their own." See Morales v. TWA, 504 U.S. 374, 378 (1992); see also Am. Airlines v. Wolens, 513 U.S. 219, 229 n.5 (1995) ("States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier."). This provision states that state and local governments "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

Unless a law directly references airline prices, routes, or services,[10] it is "related to" airline rates, routes, or services only if it has a "connection with" an carrier's routes, rates, or services that causes a "significant impact." See Morales 504 U.S. at 383–84, 388; see also Tobin

---

[10] Plaintiff does not argue that the Law directly references airline prices, routes, or services.

v Fed. Express Corp., 775 F.3d 448, 454 (1st Cir 2014) (stating that the "connection…cannot be *de minimis*"). "[S]ome state actions may affect airline [prices, routes, or services] in too tenuous, remote, or peripheral a manner to have pre-emptive effect." Morales, 504 U.S. at 390 (internal quotations omitted); see also, e.g., See Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco, 992 F. Supp. 1149, 1183 (N.D. Cal. 1998) ("If any string of contingencies is sufficient to establish a connection with price, route or service, there will be no end to ADA preemption."); Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251, 260 (2013); ("[T]he breadth of the words 'related to' does not mean the sky is the limit[.]").

"[G]enerally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide." See Dilts v. Penske Logistics, LLC, 769 F.3d 637, 646 (9th Cir. 2014) (nearly identical federal preemption provision concerning the motor-carrier and trucking industries[11] does not preempt state law mandating employee meal and rest breaks); see also Bernstein v. Virgin Am., Inc., 227 F. Supp. 3d 1049, 1070–73 (W.D. Cal. 2017) (applying Dilts to reject an air carrier's argument that the ADA preempts enforcement of the same California law to require airlines to provide meal and rest breaks to flight attendants). Generally-applicable employment regulations that "alter an air carrier's incentives but do not

---

[11] The Federal Aviation Administration Authorization Act contains an express preemption provision that limits state and local regulation over the motor-carrier and trucking industries. This provision is worded very similarly to the ADA's preemption provision. Specifically, with respect to motor carriers of property, it provides, in pertinent part, as follows: "[A] State, political subdivision of a State, or political authority of [two] or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). "This federal pre-emption provision relating to motor carriers is substantially identical to a provision pre-empting state regulation of air carriers … and the two statutes are often interpreted *in pari materia*." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 38 (1st Cir. 2012); see also Dilts v Penske Logistics, LLC, 769 F.3d 637, 644 (9th Cir 2014) ("By using text nearly identical to the Airline Deregulation Act's, Congress meant to create parity between freight services provided by air carriers and those provided by motor carriers."). Several of the cases cited in this Memorandum relate to motor carriers under the FAAA preemption provision.

dictate its choices with respect to price, route or service are not sufficient to cause preemption, unless those incentives are tantamount to a compulsion." See Air Transp. Ass'n of Am., 992 F Supp. at 1182 (internal quotations omitted).

Courts have held in various contexts that "the ADA does not preempt generally applicable laws that regulate how an airline behaves as an employer, even though the law indirectly affects the airline's prices and services." See Filo Foods, LLC v. City of SeaTac, 357 P.3d 1040, 1058 (Wash. 2015); see also Delta Air Lines v. N.Y. State Div. of Human Rights, 91 N.Y.2d 65, 70–71 (1997) (rejecting argument that ADA restricts "[s]tate regulation of employment practices"). Courts have upheld a wide range of employment regulations against similar preemption claims, including antidiscrimination,[12] prevailing-wage,[13] and whistleblower laws.[14] This is consistent with the longstanding doctrine that "[p]re-emption of employment standards within the traditional police power of the State should not be lightly inferred." See Hawaiian Airlines v. Norris, 512 U.S. 246, 252 (1994) (internal quotations omitted).

---

[12] See Abdu-Brisson v. Delta Air Lines, 128 F.3d 77 (2d Cir. 1997) (recognizing that antidiscrimination laws have "little or nothing to do with competition or efficiency"; Aloha Islandair Inc. v. Tseu, 128 F.3d 1301, 1303 (9th Cir. 1997) (airline did not raise significant safety concerns to merit ADA preemption in response to disability discrimination claim brought by monocular pilot); Air Transp. Ass'n of Am. v. City and County of San Francisco, 266 F.3d 1064 (9th Cir. 2001); Wellons v. Northwest Airlines, Inc., 165 F.3d 493 (6th Cir. 1999); Parise v. Delta Airlines, Inc., 141 F.3d 1463 (11th Cir. 1998).

[13] See Amerijet Int'l, Inc. v. Miami-Dade Cnty., 627 F. App'x 744, 751 (11th Cir. 2015) (local wage legislation is not preempted because it does not "preclude air carriers from offering services that they wish to provide" but merely "alters the incentives facing an air carrier"); accord Thompson v U.S. Airways, Inc., 717 F. Supp. 2d 468, 479 (E.D. Pa. 2010); Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184 (9th Cir. 1998); DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 87 (1st Cir. 2011).

[14] See Ventress v. Japan Airlines, 603 F.3d 676 (9th Cir. 2010); Gary v. Air Group, Inc., 397 F.3d 183 (3d Cir. 2005); Branche v. Airtran Airways, Inc., 342 F.3d 1248 (11th Cir. 2003); Ulysse v. AAR Aircraft Component Servs., 841 F. Supp. 2d 659 (E.D.N.Y. 2011).

**2.   The Law, as enforced, does not have a prohibited impact on air-carrier's prices, routes, or services.**

Application of the Law to covered flight attendants will have a similar impact as other local laws that have been upheld against similar preemption challenges, and would not compel Delta's prices, routes, or services in a prohibited manner.

"Whether there is a sufficient nexus between a protected activity and an air carrier's [price, route, or] service is a fact-specific inquiry that depends on the ability of the protected activity to disrupt the carrier's flight operations." Cunningham v. Jet Aviation Flight Servs., 2013 U.S. Dist. LEXIS 58401 (D.N.J. Apr. 22, 2013)." While some courts "look[ ] to the logical effect that a particular scheme has on" rates, routes, or services to determine whether ADA preemption applies," see Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 21 (1st Cir. 2014), the Second Circuit has recognized that preemption "in particular circumstances is difficult" and may "require extensive examination of the underlying facts." See Abdu-Brisson v. Delta Air Lines, 128 F.3d 77, 81, 84 (2d Cir. 1997).

This is one such case, as a close analysis of the impact of the Law reveals that it does not have the type of prohibited impact that the ADA preempts.

**3.   Underpinning Delta's arguments are speculative claims.**

Delta's main witness, Dr. Lee, opined that sick leave laws cannot by applied to the airline industry because if not for disciplinary points, flight attendants would take sick leave, sick leave contributes to flight delays, and flight delays will destabilize the airline industry by causing a significant disruption in prices, routes and services.   To support his assertions, Dr. Lee relies on several conclusory declarations from individuals that he never spoke to, erroneous assumptions about the Law's requirements, and several statistical analyses with overlooked deficiencies.

Declaration of Christian Tregillis, Ex. 1 (Rebuttal Expert Report of Christian Tregillis executed March 1, 2019 ("Tregillis Report") at 2-4.

### a. Delta fails to consider the Laws' provisions that provide employers' flexibility in managing sick leave.

Delta claims that, even in light of the various tools at its disposal, short-notice absences pose the greatest threat of delays. SOF 57-94. The Law permits employers to require their employees to provide notice for unscheduled absences as soon as practicable. Admin. Code § 20-914(c); 6 RCNY §7-205(b); Holt Decl., at 5 ¶ 17. Dr. Lee fails to take into account this reasonable-notice provision, or consider mitigating mechanisms that inform an airline that a flight attendant will be absent or taking sick leave. SOF ¶¶ 62-63. Holt Decl., at 5. As noted, Delta's flight attendants have necessary pre-flight responsibilities, including mandatory check in. Id. A flight attendant's failure to check in prior to a flight puts the airline on notice an hour in advance of takeoff that a reserve may be needed. See id.

Dr. Lee also incorrectly assumes that the Law's prohibition on discipline applies to all accrued leave. In fact, the Law protects only forty hours from discipline, the amount of sick leave required under the Law. Lalic Decl., Ex. D (Transcript of the February 8, 2019 Deposition of Darin Lee ("Lee Dep.")) at 59.  Indeed at the fortieth hour and first minute of leave usage, Delta can assess as many points or apply whatever method of discipline it deems suitable. Holt Decl., at 3.

### b. The record fails to show that compliance with the Law caused Virgin's JFK Base closure

Delta asserts that Virgin's purported compliance with the Law, and subsequent closure of its JFK base, is empirical evidence of the negative effects of the Law. The Virgin example is not instructive of the Law's effects on airlines for several crucial reasons. Tregillis Decl., at 4.

Dr. Lee formed his opinion based on the declaration of Jeff Butler, the Vice President of Inflight and Call Center Services for Alaska Airlines (formerly Virgin) and his own regression based analysis of Virgin data. SOF ¶¶ 126-130. In his declaration, Butler states that "the adverse operational effects, high administrative burdens, and significant increase in overhead resulting from ESTA compliance, contributed significantly to Virgin America's decision to close its base." Dr. Lee accepted this statement as given. Id. Dr. Lee never inquired what he meant by "contributed significantly," his source of information, or even what other factors contributed to the closure. Id.

Further, he presented no independent research, and failed to evaluate the practical effects of the Law on cost and satisfaction of passengers. Tregillis Decl., at 4. Instead, Dr. Lee argues, his statistical analysis illustrates "an explosion of delays" (two years after the law went into effect) such that he claims it is obvious that the Law played a significant effect on Virgin's closure. Tregillis Decl., at 4. The twenty variables studied as impacting Virgin's crew shortage delays only explain 6% of the variation in those delays. Id. at 4-5. In basic terms, there is a weak connection between sick leave and delay. The data produced shows that Virgin experienced no statistically significant increase in arrival delays in the two years immediately following its compliance with the Law. Id.

There is no competent evidence to establish that this slight increase of arrival delays—two years after compliance—was caused by the Law. Tregillis Decl., at 8-9. Even so, Dr. Lee speculates that the two year delayed increase is indicative of flight attendant's growing familiarity with the policy. Id. This assumption is in direct contrast to Dr. Lee's expert reports that emphasize that flight attendants react quickly to changes in leave and compensation policy. Id.

Neither Delta nor Dr. Lee accounted for the obvious material differences in operation and structure between Delta and Virgin. No evidence was offered supporting their contention that Delta would experience similar, if any, of the same effects. Dr. Lee also failed to take into account unique features of Virgin's JFK base. Virgin's New York City base maintained a small number of flight attendants, and was isolated on the East Coast from Virgin's larger bases. Delta suffers from none of these problems. Hundreds of flight attendants are based in John F. Kennedy Airport, and Laguardia. Delta can rely on its existing structure and draw from reserves and reassignments from neighboring bases. Additionally, Virgin's sick leave policies were never compared to Delta, leaving unclear the relative degree of change from the status quo that Virgin undertook as compared to what degree of change would be required for Delta to come into compliance.

### c. Even if Delta's claims were credited, any amount of Alleged Increase of Delay would be Imperceptible.

Delta fails to quantify or contextualize its cost of complying with the Law. Tregillis Decl., at 8-9. Even if it was proven that the Law would have an impact on the operation of Delta's New York City bases, there was no analysis of the practical impact in terms of how many flight attendants would need to be hired and at what cost. Id.

Dr. Lee offers the statistic that of the top 25% of days in terms of flight attendant sick rates, the rate of flight arrival delays also increased by 0.9 to 2.4 percentage points. Id. Although Dr. Lee continually stresses the significance of these percentage points, he fails to point out the obvious shortcomings in this analysis. Tregillis Decl., at 12-13. The slight delay claimed by Delta would be imperceptible to passengers. Id.

The fact that Delta must "factor [the Law] into their decisions" regarding staffing and operations does not give rise to federal preemption. See Dilts, 769 F.3d at 646. 2) Thus, the Law

is not "tantamount to a compulsion" to merit federal preemption, see Air Transp. Ass'n of Am., as Delta will maintain control over its own prices, routes, and services, with limited disruption; 3) The mere fact that compliance with the Law may "make[] it more costly for [Delta] to choose some routes or services relative to others, leading [it] to reallocate resources or make different business decisions," is insufficient to merit federal preemption. See Dilts, 769 F.3d at 647; 4) Because the Law does not "directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services," it is permissible under federal law. See Dilts, 769 F.3d at 647.

ESSTA is similar to the challenged regulation in Bernstein v. Virgin Am., Inc., 227 F. Supp.3d at 1070–73, which upheld the application of a California law of general applicability requiring Virgin Airlines to provide meal and rest breaks to its flight attendants.[15] Relying on Dilts, the Court upheld the application of law to Virgin, and rejected Virgin's argument that "providing duty-free breaks to its employees would affect service and routes," explaining that the airline "simply must hire a sufficient number of [flight attendants] and stagger their breaks for any long period in which continuous service is necessary." See Bernstein, 227 F.Supp.3d at 1073. Although enforcement of the Law has not been proven to produce any effect that would be require Delta to hire additional flight attendants. However, even if it did, Delta would simply hire a sufficient number of flight attendants, including reserves, and schedule them to ensure enough flight attendants to cover the additional sick leave that the Law provides, as was found to be permissible in Bernstein.

This case is also similar to Filo Foods, LLC v. City of SeaTac, 357 P.3d 1040, 1058 (Wash. 2015), in which the Washington Supreme Court held that the ADA does not preempt a

---

[15] Although the Southern District of California reached the opposite conclusion in Blackwell v. Skywest Airlines, Inc., 2008 U.S. Dist. LEXIS 97955 (S.D. Cal. Dec. 3, 2008), this opinion was issued before the Ninth Circuit decided Dilts, and should not be relied upon.

local ordinance requiring that certain hospitality and transportation employees receive one hour of paid sick leave per 40 hours worked. Recognizing that "the ADA does not preempt generally applicable laws that regulate how an airline behaves as an employer, even though the law indirectly affects the airline's prices and services," the Court held that the ADA does not exempt employees of Alaska Airlines stationed at Seattle-Tacoma International Airport from the law. See id. While the Court further recognized that the law may "may impose costs on airlines" in order to comply, it found this to be "inconsequential." See id.

The case law cited by Plaintiff, finding that state whistleblower laws are preempted under specific circumstances, is easily distinguishable. For instance, in Botz v. Omni Air Int'l, 286 F.3d 488, 497 (8th Cir. 2002), the Eighth Circuit found that a flight attendant's state whistleblower claim was preempted when she, on short, notice refused to work a shift assignment on short notice that she believed violated federal safety regulations. Preemption there there was appropriate because application of the state statute would cause a "significant likelihood" that the airline would have "to cancel the flight." See Botz, 286 F.3d at 495. The same cannot be said in this case, as Delta has failed to show any factual connection between compliance with the Law and an impact on staffing levels.

Similarly, in Cunningham v. Jet Aviation Flight Servs., 2013 U.S. Dist. LEXIS 58401 (D.N.J. Apr. 22, 2013), a pilot's refusal to fly was found to be related to the services of a "private air carrier with only two regional pilots." Quoting Botz, the Court explained that "while a 'large air carrier employing hundreds of flight attendants might encounter few difficulties' replacing one refusing to fly, that 'might prove problematic or even impossible . . . for a small carrier.'" See Cunningham, 2013 U.S. Dist. LEXIS 58401, at *9 (quoting Botz, 286 F.3d at 494–95). Suffice it to say, Delta is not a "small carrier." Indeed, Delta has nearly 23,613 active flight

28

attendants, with 4,343 flight attendants based in the New York region, and regularly staffs a significant amount of flight attendants on reserve duty in New York. Lalic Decl., (Delta's Objections and Responses to Defendants' First Set of Interrogatories) at Interrogatory Response No. 2. Replacing a flight attendant who calls in sick, even on short notice, is well within Delta's ability. See id.; Lalic Decl., Ex. F (Cook Decl.) at 8.

Finally, any negligible cost increase that Delta may incur to comply with the Law does not give rise to a preemption claim. While "any state regulation of the employer-employee relationship will have at least some effect on the operating costs of a business, which in turn affects the rates and prices charged," a regulated carrier must demonstrate more than a "remote" or "peripheral" effect. See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 957 F. Supp. 1121, 1129 (N.D. Cal. 1997), aff'd 152 F.3d 1184 (9th Cir. 1998) (internal quotations omitted); see also Dilts, 769 F.3d at 646 (recognizing that employment laws "are not preempted even if they raise the overall cost of doing business"). Indeed, the Second Circuit has found that a wage increase that "would amount to about 0.86% of Delta's 1995 expenses and about 0.81% of Delta's 1995 revenues" would "have an inconsequential impact on Delta's pricing" such that it "would not warrant preemption." See Abdu-Brisson v. Delta Air Lines, 128 F.3d 77, 83–85 (2d Cir. 1997).

## POINT II

### THE LAW IS A LEGITIMATE EXERCISE OF POLICE POWER UNDER THE DORMANT COMMERCE CLAUSE

Plaintiff is incorrect that the Law, as applied by the Department to covered flight attendants, violates the dormant Commerce Clause.

29

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, § 8, cl. 3. Under the "'dormant' Commerce Clause doctrine, a state's power to take actions impacting interstate commerce is limited." See Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). The dormant Commerce Clause is chiefly concerned with economic protectionism, which consists of "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." See New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).

There is a distinction between local regulatory frameworks that are protectionist in nature, which are subject to a high level of scrutiny, and those—like the Law—that are premised on general police power, which are presumptively valid. See Maine v. Taylor, 477 U.S. 131, 138 (1986). And because employment law and "consumer protection [are] traditionally subject to state regulation, [w]e should be particularly hesitant to interfere with the [State's] efforts under the guise of the Commerce Clause." See SPGGC, LLC v. Blumenthal, 505 F.3d 183, 194 (2d Cir. 2007) (internal quotations omitted); see also De Canas v. Bica, 424 U.S. 351, 356 (1976) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum wage and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples.")

The application of local law may violate the dormant Commerce Clause if it: 1) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question," 2) "clearly discriminates against interstate commerce in favor of intrastate commerce," or 3) "imposes a burden on interstate commerce incommensurate with the

local benefits secured." <u>Jones v. Schneiderman</u>, 974 F. Supp. 2d 322, 349 (S.D.N.Y. 2013) (internal quotations and citations omitted).[16]

### 1.   The Department's Enforcement Efforts Do Not Regulate Conduct Occurring Wholly Outside the State.

While most of Delta's arguments under its second cause of action are aimed at the first prong of the dormant Commerce Clause test, Delta fails to demonstrate that the Department's enforcement efforts with respect to flight attendants control commerce occurring entirely outside New York State.

"[I]t is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects," and "[t]he Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." <u>Instructional Sys., Inc. v. Computer Curriculum Corp.</u>, 35 F.3d 813 (3d Cir. 1994). Rather, the Supreme Court has held that a state or local violates the prohibition against extraterritoriality only when it "has the practical effect of regulating commerce occurring wholly outside that State's borders." <u>See</u> <u>Healy v Beer Inst.</u>, 491 U.S. 324, 332 (1989). "'The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids.'" <u>Freedom Holdings, Inc. v. Spitzer</u>, 357 F.3d 205, 220-21 (2d Cir. 2004) (<u>quoting</u> <u>Osborn v. Ozlin</u>, 310 U.S. 53, 62 (1940)).

The Supreme Court's decision in <u>Pharm. Research & Mfrs. of Am. v. Walsh</u>, 538 U.S. 644, 650, 668–70 (2003) illustrates the doctrine's limitations. In this case, the Supreme Court rejected plaintiff's argument that a Maine law restricting access to pharmaceutical manufacturers that do not reduce prescription drug prices "effectively regulates out-of-state commerce," despite

---

[16] Plaintiff appears to concede that the challenged enforcement efforts do not clearly discriminate against interstate commerce in favor of intrastate commerce. Accordingly, this Memorandum only addresses the first and third prongs of the dormant Commerce Clause analysis.

the fact that prices are typically determined through negotiations between manufacturers and wholesalers that occur outside the state. See id. at 650. The Court explained that regardless of the law's actual effects on out-of-state commercial activity, the challenged law "does not regulate the price of any out-of-state transaction" or "insist that manufacturers sell their drugs to a wholesaler for a certain price." See id. at 669. "Several circuits have questioned the continuing vitality of the of the extraterritoriality doctrine following [this] decision," see Assn. for Accessible Medicines v. Frosh, 887 F.3d 664, 681 (4th Cir. 2018) (citing cases), and there is "not…a single Supreme Court dormant Commerce Clause holding that relied exclusively on the extraterritoriality doctrine to invalidate a state law." See Am. Beverage Ass'n v. Snyder, 735 F.3d 362, 381 (6th Cir. 2013) (Sutton, J., concurring).

For instance, in several cases raising similar extraterritoriality claims as this one, Courts have held that the dormant Commerce Clause does not invalidate the application of a state's employment statute to work performed by employees based inside the state while working beyond state lines. Perhaps most notably, the Washington Supreme Court found that the state's law requiring employers to pay overtime payments to their in-state employees lawfully applied to all work performed by covered employees, including out-of-state work by truck drivers. See Bostain v. Food Express, Inc., 153 P.3d 846, 856 (Wash. 2007). The Court held that the imposition of overtime for out-of-state work was not "completely unrelated to Washington" because the challenged law primarily "applies to Washington-based employees." See id. (internal quotations omitted). Likewise, in Mendis v Schneider Nat'l Carriers Inc., 2016 U.S. Dist. LEXIS 156695, at *18-19 (W.D. Wash Nov. 10, 2016), the Court found that the dormant Commerce Clause does not exempt a trucking company from complying with Washington State's law mandating rest breaks to a truck driver, including for work performed outside the state.

Much like in <u>Bostain</u> and <u>Mendis</u>, the Department's challenged enforcement actions would impact employees that work in-state and have a sufficient nexus to New York such that they do not regulate commerce that is "wholly outside" the state. To qualify for coverage under the Law, an employee must be employed for hire within the city of New York for more than eighty hours in a calendar year and performs work on a full-time or part-time basis." <u>See</u> Administrative Code § 20-912 (statutory definition of "employee"). The Department "applies a rebuttable presumption that flight crew employees based out of New York City airports work 80 or more hours per calendar year in New York City and thus meet the definition of 'employee' under the Law." <u>See</u> Lalic Decl., Ex. B (enforcement policy) at 1.[17] The three Delta flight attendants whose complaints prompted the Department to investigate and formed the basis of the Paid Sick Leave Petition were based in New York. <u>See</u> Holt Decl. at 8. Thus, the Department's enforcement efforts apply to flight attendants who are based in New York, and thus have a substantial connection to the state.[18]

The Law also regulates commerce that occurs largely within the state and has a substantial in-state impact. In fact, the Department has specifically provided that covered flight attendants may only use the sick time to which they are entitled to under the Law "for any flight originating or ending in New York City." <u>See</u> Lalic Decl., Ex. B (enforcement policy) at 2.[19]

---

[17] "To rebut this presumption, an airline employer must demonstrate that a flight crew employee based out of a New York City airport in fact worked fewer than eighty hours within the city limits during the calendar year. To do this, the airline employer need only count the time the employee worked while physically present in New York City." Ex. ## at 1.

[18] When assessing a dormant Commerce Clause claim, the Court should "construe the [challenged provision] narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." <u>See</u> S.D. Myers, Inc. v City & County of San Francisco, 253 F.3d 461, 468 (9th Cir 2001); <u>see also</u> <u>Able v. United States</u>, 88 F.3d 1280, 1297 (2d Cir. 1996).

[19] To the extent that Plaintiff alleges that the Department's enforcement efforts regulate commerce wholly outside New York by conferring upon flight attendants the right to take sick leave on flights that do not originate or terminate therein, it is mistaken. Holt Decl. at 7-8.

Thus, the Department's enforcement efforts would only regulate commerce that has a close and direct nexus to New York City; namely, by permitting flight attendants who regularly work in the City, mainly New York City-based flight attendants, to use their accrued sick leave on flights that originate or terminate in the City. The mere fact that the law would impact the employer-employee relationship for some work performed out of state does not by itself substantiate a Commerce Clause challenge, see Bostain, 153 P.3d at 856, nor does the fact that it may require the airline to modify some of its operational practices outside the city to accommodate for this impact, see Mendis, at *18–19.

    As the Department is regulating flight attendants who are based within the state for work performed largely within state borders, it cannot be said that the Department is regulating wholly outside state boundaries in violation of the dormant commerce clause's prohibition on extraterritorial regulation. See Stone v. Frontier Airlines, Inc. (In re Estate of Stone), 256 F. Supp. 2d 28, 46 (D. Mass 2002) (tort lawsuit that would "essentially… impos[e] a requirement that airlines carry defibrillators" does not violate the dormant Commerce Clause since the defendant airline "flies in and out of Boston…, that [plaintiffs] were residents of Massachusetts, and that [plaintiffs] made the arrangements for the flight in Boston… the regulation in question certainly does not address commerce that is 'wholly outside' Massachusetts." (quoting Healy, 491 U.S. at 336)).

    Delta's argument that enforcement of the Law with respect to flight attendants would require Delta to "alter [its] uniform global policies, such as Delta's attendance and reliability policies" is grossly exaggerated. See Complaint ¶ 76. As described above, the Law only confers benefits upon employees who work for more than eighty hours in New York City in a given year. See Administrative Code § 20-912. As the Department's guidance recognizes, this applies

namely to flight attendants based in New York City, by creating a rebuttable presumption that New York-based flight attendants are covered under the Law. See Lalic Decl., Ex. B (enforcement policy) at 1. Accordingly, compliance with the Law would require Delta to provide mandated sick leave to flight attendants based out of New York—but would not, as Plaintiff suggests, require Delta to make broad changes to its nationwide reliability policies for flight attendants based outside the City.

Additionally, Delta's claim that it "could… be subject to multiple different and sometimes conflicting state and municipal paid sick leave laws," see Complaint ¶ 74, does not bolster its claim. For one, "mere speculation about the possibility of conflicting legislation" does not give rise to a dormant Commerce Clause claim. See S.D. Myers, Inc. v City & County of San Francisco, 253 F.3d 461, 470 (9th Cir 2001); see also Bernstein, F. Supp.3d at 1065–66 (rejecting argument that subjecting flight attendants to California wage and hours laws "will necessarily be required to comply with each state's wage and hour laws" for numerous reasons, stating that "Virgin has presented no evidence to support its contention that it will be required to comply with other states' laws" and the law was being applied based on "performed work based out of California airports"). The Department's enforcement policies with respect to flight attendants limit the out-of-state impact on the Law, stopping well short of the constitutional limit.

As the Department is not regulating extraterritorially, its enforcement efforts satisfy the first prong of the dormant Commerce Clause analysis. See Freedom Holdings, 357 F.3d at 221 (recognizing that "'innumerable valid state laws affect pricing decisions in other States' and cautioning against allowing Commerce Clause jurisprudence to 'degenerate into disputes over

degree of economic effect'") (quoting Healy, 491 U.S. at 345 (Scalia, J., concurring in part and concurring in the judgment)).

### a.   Plaintiff Cannot Make Out a Claim Under the Pike Balancing Test

The third prong of the dormant Commerce Clause applies when a statute's effect on interstate commerce is incidental. See Pike v. Bruce Church Inc., 397 U.S. 137, 142 (1970). Under Pike, courts uphold nondiscriminatory statutes that have incidental effects on interstate commerce unless the burden on such commerce is "clearly excessive" to the local benefit. See id.

The burden "appropriately considered in Commerce Clause balancing [under Pike] is the degree to which the [challenged] state action incidentally discriminates against interstate commerce relative to intrastate commerce." See Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 406 (3d Cir. 1987). "[V]irtually all state regulation involves increased costs for those doing business within the state, including out-of-state interests doing business in the state as well as in-state interests.... Where the 'burden' on out-of-state interests is no different from that placed on competing in-state interests, however, it is a burden on commerce rather than a burden on interstate commerce." Id. at 406 (emphasis in original).

Thus, in Pike itself, the incidental burden on interstate commerce was excessive in relation to the putative local benefit of the even-handed Arizona state regulation challenged because the practical effect of the state regulation was to require the plaintiff, a California melon grower, to build packing facilities in Arizona.  This effect was found to be discriminatory against interstate commerce because it imposed a greater burden on out-of-state melon growers than it did on Arizona melon growers. See Pike, 397 U.S. at 140–42.

In contrast, in Minnesota v. Cloverleaf Creamery, Inc., 449 U.S. 456 (1981), the Supreme Court sustained the validity of an evenhanded Minnesota law banning the retail

sale of milk in plastic jars against a Commerce Clause challenge by out-of-state dairies forced to comply with Minnesota's packaging requirements to enter the Minnesota marketplace. The Court noted that while the Minnesota marketplace would presumably favor those manufacturers who produced complying containers, there was "no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms." See Cloverleaf Creamery, 449 U.S. at 472–73. Thus, the Supreme Court determined that the burden on interstate commerce, if any, was "relatively minor." See id. at 472.

To the extent that enforcement of the Law would impact Delta's operations (and, perhaps, the operations of other air carriers) this represents a burden on commerce, not interstate commerce specifically. New York-based carriers, such as Jet Blue, are equally subject to the Law, and would have to tailor their attendance and reliability policies similarly to comply with the Law. In fact, air carriers with more extensive operations in New York would be more impacted by the Law—not less—since they would have more covered flight attendants. On its face, therefore, Delta's dormant Commerce Clause claim under Pike fails. See, e.g., N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 91 (2d Cir. 2017) (dismissing dormant Commerce Clause claim under Pike because plaintiff failed to plausibly allege an "incidental burden… that weighs more heavily on interstate commerce than intrastate commerce").

In any event, even considering the impact of the Law on commerce generally, the evidence does not support Delta's claim that the burden is "clearly excessive" to the local benefit. For one, the Law has significant local health benefits, both for employees and for the public at large, particularly when applied to covered flight attendants departing or arriving in New York City. See generally Mendis v Schneider Nat'l Carriers Inc., 2016 U.S. Dist. LEXIS 156695, at *17 (Washington State's "rest break provision furthers a legitimate public interest").

In particular, coverage of flight attendants under the Law would protect against sick flight attendants from boarding a flight. This is not only beneficial to the employee's recovery, but could have substantial public health effects in New York City, by ensuring that passengers on flights into and out of the City are not stuck in the cabin with contagious flight attendants.

Relative to these important benefits, the effects on Delta's commercial operations are relatively light.

Delta is simply incorrect that it would have to "monitor and keep track of each hour worked by each flight attendant in each city and state nationwide in order to determine whether he or she has become eligible for and can use the applicable law in each jurisdiction." See Complaint ¶ 75. While the City cannot speculate with respect to what standards other jurisdictions may set, compliance with the Law is straightforward, and does not involve detailed hour counting on a jurisdiction-by-jurisdiction basis. With respect to coverage, the Law "applies a rebuttable presumption that flight crew employees based out of New York City airports work 80 or more hours per calendar year in New York City" and thus are covered under the Law. See Ex. ## at 1. Thus, Delta does not need to track the specific number of hours worked by each employee in the City; if it provides the benefits required under the Law to its New York-based flight attendants, it has complied with the Law.

Nor does Delta need to track the number of hours flown in each jurisdiction for the purposes of accrual. The Law requires employers to provide at least one hour of sick time per 30 hours worked, see Administrative Code § 20-913(b), and the Department's guidance clarifies that "all hours worked for an employer count toward an employee's safe and sick leave accrual, regardless of the employee's or the employer's location." See Ex. ## at 2. Thus, Delta simply needs to track the total number of hours worked by covered flight attendants regardless of

location—information that it presumably tracks anyway—to know how much leave a flight attendant has accrued. And with respect to usage, the Department provides that covered flight attendants may use their accrued leave for any flight originating or ending in New York City. See id.

Accordingly, Hirst v. Skywest, Inc., is instructive. 2018 U.S. App. LEXIS 34926 (7th Cir Dec. 12, 2018, Nos. 17-3643, 17-3660). There, the plaintiff flight attendants sought liability—namely, the imposition of Illinois' prevailing-wage law to flight attendants based in-state for the hours they worked inside the state. The Court held "the existence of a great regulatory burden on an employer does not necessarily mean minimum wage laws have a discriminatory effect on interstate commerce," and further "State and local wage laws can burden companies within their own localities just as much, if not more, than out-of-state ones." Id. at 10. All airlines are subject to these laws, regardless of state citizenship. (internal quotations omitted).

In sum, enforcement of the Law with respect to flight attendants would provide important public health benefits to New York residents and visitors, while imposing a manageable burden that would not disproportionately impact out-of-state firms. Accordingly, Plaintiff cannot make out a claim under the Pike balancing test, and its dormant Commerce Clause claim fails in its entirety.

## POINT III

### THE DEPARTMENT'S ENFORCEMENT EFFORTS DO NOT VIOLATE ITS JURISDICTION UNDER STATE LAW

Delta asserts that the Department is acting in violation of state law, specifically the New York State Constitution (the "State Constitution"), by regulating "beyond [its] boundaries." See

Complaint ¶ 82. This claim fails for similar reasons as the extraterritoriality analysis under the dormant Commerce Clause.

The State Constitution, much like the U.S. Constitution, does not restrict the extraterritorial reach of a municipality's regulation as much as Plaintiff suggests. The municipality's regulation is valid so long as there is a sufficient local nexus. See, e.g., Allied-Signal, Inc. v. Comm'r of Fin., 79 N.Y.2d 73, 80 (1991) (holding that the City of New York may impose local taxes with extraterritorial impacts to the extent permitted by the Commerce Clause, including taxes on income that a non-domicillary investor corporation received from another corporation domiciled in the city because "a sufficient nexus existed to support the City's tax"); Bakalar v Lazar, 71 Misc. 2d 683, 686 (Sup. Ct. N.Y. Co. 1972) (recognizing that "a municipality may exercise its police power extraterritorially to protect a dominant local interest of such municipality") (internal quotations omitted); Hoffman v. Parade Publs., 15 N.Y.3d 285, 290 (2010) (employment discrimination claims under the New York City Human Rights Law merely requires that the alleged discriminatory conduct occur within the state and have an "impact" within the City).

This Court's decision in Bakeer v. Nippon Cargo Airlines, Co., 2011 U.S. Dist. LEXIS 90102 (E.D.N.Y. July 25, 2011), adopted by Michaud v Nippon Cargo Airlines, Co., 2011 US Dist. LEXIS 128705 9 (E.D.N.Y. Nov. 7, 2011), is particularly instructive for the instant case. The plaintiffs in Bakeer were a group of flight engineers based out of John F. Kennedy Airport. They were not City residents and "spent the vast majority of their working time outside New York," flying to various international locations for the principal defendant, an international air-cargo transportation company based in Japan. See Bakeer, 2011 U.S. Dist. LEXIS 90102, at * 127. Plaintiffs sued under the N.Y.C. Human Rights Law, alleging that they were the subjects of

employment discrimination based on the company's failure to provide raises, retirement benefits, and training that was provided to the company's Japanese flight engineers. See id. at *18. This Court denied Defendants' motion to dismiss the complaint on the grounds that the alleged discriminatory conduct did not occur in New York, adopting plaintiffs' argument that "because the discriminatory decisions were made in part in New York and had an impact on New York, where plaintiffs worked at JFK, the claims are covered by [the N.Y.C. Human Rights Law]." See id. at *128 (citing Hoffman, 15 N.Y.3d at 289–90).

As in Bakeer, the local impact of the challenged enforcement actions makes them a lawful exercise of the Department's authority under state law. Much like Bakeer, the protected employees in this case are in-flight airline crews that are based in New York but may work primarily in other jurisdictions including national airspace. Likewise, applying the challenged regulations in this scenario would have a local benefit that could also have ripple effects in other jurisdictions. Specifically, the Department's challenged enforcement efforts would allow qualifying flight attendants to accrue and use sick leave as set forth in the Law for all flights originating or terminating in New York City. This would clearly have an "impact" on New York City, and, as such, is a permissible exercise of the City's police power under the New York State Constitution.

## POINT IV

### THE LAW AND REGULATORY GUIDANCE SUFFICIENTLY ADVISE PLAINTIFF AS TO HOW TO PROVIDE MANDATED SICK LEAVE TO ITS IN-FLIGHT CREW

As their final cause of action, Delta asserts that the Law is unconstitutionally vague as applied "because it fails to clearly set forth how the Law applies to Delta and in particular to its

In-Flight Crew." Delta's claim falls well short of the high standard for striking down economic regulations as unconstitutionally vague, particularly in light of the detailed guidance that the Department has provided.

### 1. Laws of Sufficient Clarity to Give a Reasonable Opportunity to Know What is Required or Prohibited are Not Vague.

A law or regulation may be unconstitutionally vague if it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited," and if it fails to "provide explicit standards for those who apply them" such that it allows "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." See Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972). This is a high standard, as the law or regulation must be "so vague and indefinite as really to be no rule or standard at all." See Boutilier v. INS, 387 U.S. 118, 123 (1967). Additionally, "[t]he degree of vagueness permitted varies with the nature of the enactment and the correlative needs for notice and protection from unequal enforcement." Ass'n of Int'l Auto. Mfrs. v. Abrams, 84 F.3d 602, 614 (1996).

"When, as in this case, no constitutional rights are implicated and a statute regulates only economic activity, the Supreme Court approves a 'less strict vagueness' review." Advance Pharm., Inc. v. United States, 391 F.3d 377, 397 (2d Cir 2004) (quoting Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498 (1982)). See also, e.g., Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972) ("In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed."). "In reviewing [such] vagueness challenges, courts have consistently upheld the use of phrases which on their face are not particularly descriptive." Textile Workers Pension Fund v Std. Dye & Finishing Co., 725 F.2d 843, 856 (2d Cir. 1984) (citing numerous cases).

In order to succeed on a vagueness challenge, a plaintiff must do more than show that the provision of law in question employs "an imprecise but comprehensible normative standard." United States v. Schneiderman, 968 F.2d 1564, 1567 (2d Cir. 1992), cert. denied, 507 U.S. 921 (1993). The due process clause does not require that a law be drafted with such specificity that it leaves no room for interpretation, nor is it void for vagueness merely because situations may exist in which it should not be applied. Grayned, supra at 108-110. "Condemned to the use of words, we can never expect mathematical certainty from our language." Id. at 110. As the Supreme Court stated:

> [T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the [challenged provisions] may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

Broadrick v. Oklahoma, 413 U.S. 601, 608 (1973), quoting Civil Service Commission v. National Ass'n of Letter Carriers, 413 U.S. 548, 578-79 (1973).

The Law and its implementing regulations offer sufficient clarity such that a "person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited." See Grayned, 408 U.S. at 108. For instance, the Law covers any employee, including airline flight attendants, "who is employed for hire within the city of New York for more than eighty hours in a calendar year who performs work on a full-time or part-time basis." See Administrative Code § 20-912 (statutory definition of "employee"). It provides that each employee must accrue sick time at "a minimum of one hour … for every thirty hours worked," see Administrative Code § 20-913(b), as well as the circumstances in which employees may use their sick time. See Administrative Code § 20-914(a)(1). And the Law allows employers to require "reasonable notice" of the use of sick time, see Administrative Code § 20-914(c), which is as descriptive as other phrases that

have been upheld as sufficiently definite. See Ass'n of Int'l Auto. Mfrs, 84 F.3d at 614 (cataloging non-descript language permitted "[i]n the context of commercial regulation," e.g. "shortest practicable route," "near proximity," and "unreasonably low prices.").

The Department's guidance, titled "Airline Flight Crew under the New York City Earned Safe and Sick Time Act," specifically addresses the application of the Law to airline flight attendants, including the alleged ambiguities raised by Plaintiff in its Complaint. The Court should consider administrative guidance, in addition to statutory and regulatory provisions, in assessing whether administrative enforcement efforts are unconstitutional under the vagueness doctrine. See Advance Pharm., 391 F.3d at 397 (law was not unconstitutionally vague as applied after clarification was provided in a "meeting with DEA investigators and in two subsequent meetings with federal prosecutors"); Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 480 (2d Cir. 1999) (no claim for vagueness after "extensive guidance" was provided). For instance, the Department's guidance provides that flight attendants "accrue safe/sick leave at the same rate as other covered employees," i.e. one hour per thirty hours worked "all hours worked for an employer count toward an employee's safe and sick leave accrual, regardless of the employee's or the employer's location." See Lalic Decl. Ex. B (enforcement guidelines) at 2. This necessitates a simple calculation that obviates Plaintiff's concern that it must "track accrual and usage…in each and every jurisdiction." See id.; Complaint ¶ 90(d). The Department's guidance also provides that "[a] covered flight crew employee may use accrued safe/sick time hours under the Paid Safe and Sick Leave Law for any flight originating or ending in New York City," which answers Plaintiff's question as to "whether In-Flight Crew can only use leave under the Law… while they are working in New York City." See Lalic Decl. Ex. B (enforcement guidelines) at 2; Complaint ¶ 90(e).

Additionally, while Plaintiff questions "when an employee is considered to be working in New York City (as opposed to merely passing through or working in federal airspace)," Complaint ¶ 90(a), the Department's guidance states that it counts actual time spent on the ground such as time worked before take-off on flights departing from a New York City airport and after landing for flights arriving to a New York City airport." <u>See</u> <u>See</u> Lalic Decl. Ex. B (enforcement guidelines) at 2. And Plaintiff's questions as to "how the minimum increment requirement applies to In-Flight Crew whose flight is more than four hours," Complaint ¶ 90(b), are answered by the Department's guidance "recogniz[ing] an exception to the Law's minimum increment provision" by allowing the "employer [to] require a flight crew employee to use an amount of safe/sick leave equal to the expected or actual duration of a missed flight." <u>See</u> Lalic Decl. Ex. B (enforcement guidelines) at 2.

The Law and its implementing regulations provide sufficient guidance to clear the low hurdle to overcome a vagueness challenge with respect to economic regulations. Accordingly, Plaintiff's fourth cause of action, alleging a constitutional vagueness claim, fails.

**<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff's motion for summary judgment should be denied, and Defendants' motion for summary judgment should be granted in its entirety.

Dated:     New York, New York
           September 27, 2019

<div style="margin-left:40%">

GEORGIA M. PESTANA
Acting Corporation Counsel of
the City of New York
Attorney for Defendants
100 Church St.
New York, New York 10007
Email: alalic@law.nyc.gov
Tel: (212) 356-2215
Fax: (212) 356-2019


By:     _____/s/_____
        Annette M. Lalic
        Assistant Corporation Counsel

</div>

46