UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

DELTA AIR LINES, INC.,

                                 Plaintiffs,

             -against-

THE NEW YORK CITY DEPARTMENT OF
CONSUMER AFFAIRS and LORELEI SALAS, in her
official capacity as Commissioner of the NEW YORK
CITY DEPARTMENT OF CONSUMER AFFAIRS,

                           Defendants.

Civil Action No.
17-cv-1343 (ILG) (RML)

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGEMENT

JAMES E. JOHNSON
Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
(212) 356-2215
(212) 356-2011

SHERYL NEUFELD
ANNETTE M. LALIC

Of Counsel.

April 30, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

A. THE LAW DOES NOT VIOLATE THE AIRLINE DEREGULATION
ACT.................................................................................................... 2

1. Delta's claims regarding the Law's "logical"
impact on its routes and services are based on
speculation. ...................................................................... 5

2. Delta's Virgin America example presents a
fatally flawed analysis. .................................................... 9

3. Air Transp. Assn. of Am. v Washington Dept.
of Labor & Indus. provides an accurate
analysis of the Law's impact on Delta's
operations. ....................................................................... 13

B. THE LAW DOES NOT VIOLATE THE DORMANT COMMERCE
CLAUSE. .......................................................................................... 19

1. The Local Law does not regulate
extraterritorially.............................................................. 21

2. Delta fails to prove the Law will substantially
burden interstate commerce............................................. 24

C. THE LAW IS NOT UNCONSTITUTIONALLY VAGUE. .................... 27

CONCLUSION............................................................................................................ 29

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                          <u>**Pages**</u>

<u>Abdu-Brisson v. Delta Air Lines,</u>
    128 F.3d 77 (2d Cir. 1997)......................................................................3, 4, 19

<u>Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco,</u>
    992 F. Supp. 1149 (N.D. Cal. 1998) .................................................................16

<u>Air Transp. Assn. of Am. v Washington Dept. of Labor & Indus.</u>
    410 F. Supp. 3d 1162 (WD Wash 2019),
    appeal filed, 19-cv-35937 (9th Cir. Nov. 8, 2019)..............................13, 14, 15, 17, 20, 21, 23

<u>American Airlines, Inc. v Wolens,</u>
    513 U.S. 219 (1995)....................................................................................18

<u>Bernstein v. Virgin Am.,</u>
    Inc., 227 F. Supp. 3d 1049, 1069 (N.D. Cal. 2017)...............................................21

<u>Bibb v. Navajo Freight Lines,</u>
    Inc., 359 U.S. 520, 527 (1959).....................................................................20

<u>Bostain v. Food Express, Inc.,</u>
    153 P.3d 846 (Wash. 2007)...........................................................................22

<u>Branche v. Airtran Airways, Inc.,</u>
    342 F3d 1248 (11th Cir 2003) ......................................................................3, 5

<u>City of Burbank v. Lockheed Air Terminal, Inc.,</u>
    411 U.S. 624 (1973)....................................................................................20

<u>CTS Corp. v. Dynamics Corp. of Am.,</u>
    481 U.S. 69 (1987).....................................................................................27

<u>Dan's City Used Cars, Inc. v. Pelkey,</u>
    569 U.S. 251 (2013)................................................................................16, 17

<u>De Canas v. Bica,</u>
    424 U.S. 351 (1976)....................................................................................20

<u>Exxon Corp. v Governor of Maryland,</u>
    437 US 117 (1978).....................................................................................25

<u>Freedom Holdings, Inc. v Spitzer,</u>
    357 F3d 205 (2d Cir. 2004).......................................................................23, 24

**Cases**                                                                                                      **Pages**

Goodspeed Airport, LLC v. E. Haddam Inland
    Wetlands & Watercourses Comm'n,
    681 F. Supp.2d 182 (D. Conn. 2010),
    aff'd 634 F.3d 206 (2d Cir. 2011)..................................................................2, 5

Goodspeed Airport LLC v. E. Haddam Inland
    Wetlands & Watercourses Commn.,
    634 F3d 206 (2d Cir 2011)..........................................................................3

Grayned v City of Rockford,
    408 U.S. 104 (1972)...............................................................................28, 29

Hawaiian Airlines v. Norris,
    512 U.S. 246 (1994).................................................................................3

Healy v Beer Inst.,
    491 U.S. 324 (1989)...............................................................................22

Hirst v. Skywest, Inc.,
    910 F.3d 961 (7th Cir. 2018) ....................................................................20

Hodges v Delta Airlines,
    44 F3d 334 (5th Cir 1995) .......................................................................3

Huron Portland Cement Co. v. City of Detroit, Mich.,
    362 U.S. 440 (1960).................................................................................19

Instructional Sys. v Computer Curriculum Corp.,
    35 F3d 813 (3d Cir 1994)..........................................................................23

Maine v. Taylor,
    477 U.S. 131 (1986).................................................................................20

Mass. Delivery Ass'n v. Coakley,
    769 F.3d 11 (1st Cir. 2014).......................................................................3

Mendis v Schneider Nat'l Carriers Inc.,
    2016 U.S. Dist. LEXIS 156695 ...................................................................22

Morales v TWA,
    504 US 374 (1992)...............................................................................16, 18

Northwest Airlines, Inc. v. State of Minnesota,
    322 U.S. 292 (1944)................................................................................20

Northwest, Inc. v. Ginsberg,
    572 U.S. 273 (2014)..............................................................................17, 18

**Cases**                                                                                                                                                   **Pages**

NY State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
    514 US 645 (1995)..............................................................................................................................4, 19

Pac. Merchant Shipping Assn. v Goldstene,
    639 F3d 1154 (9th Cir 2011) .............................................................................................21

Pike v. Bruce Church Inc.,
    397 U.S. 137 (1970)...................................................................................................25, 26

Sakellaridis v. Polar Air Cargo, Inc.,
    104 Supp. 2d 160 (E.D.N.Y. 2000)..................................................................................3

SPGGC, LLC v. Blumenthal,
    505 F.3d 183 (2d Cir. 2007)............................................................................................20

Tobin v Fed. Express Corp.,
    775 F.3d 448 (1st Cir 2014) ............................................................................................16

Ulysses v. AAR Aircraft Component Servs.,
    841 F. Supp.2d 659 (E.D.N.Y. 2011) ......................................................................3, 5, 18

United States v. Schneiderman,
    968 F.2d 1564 (2d Cir. 1992),
    cert. denied, 507 U.S. 921 (1993) ...................................................................................28

**Statutes**

6 RCNY § 7-205 (d) ..................................................................................................................12, 13

6 RCNY § 7-215 ................................................................................................................7, 8, 9, 11

29 U.S.C. § 2651(b) ........................................................................................................................21

Admin. Code § 20-912 ...............................................................................................................22, 26

Admin. Code 20-913 (b)-(d), 9-22 ...............................................................................................5, 6, 7

Admin Code 20-913(f)......................................................................................................................26

Admin. Code § 20-914......................................................................................................................21

Admin. Code § 20-914(c)..................................................................................................................12

Admin. Code § 20-914(f)....................................................................................................................7

Los Angeles Mun. Code, ch. XVIII, art. 7, § 187.04 (G) ...............................................................21

Defendants City of New York Department of Consumer Affairs ("DCA") and Lorelei Salas, as Commissioner of DCA, submit this memorandum of law in further support of their Motion for Summary Judgment.[1]

## **PRELIMINARY STATEMENT**

The importance of protected sick leave could not be more apparent than it is now — as New York City is ravaged by the highly infectious COVID-19 outbreak and is experiencing one of the highest death tolls in the world. Getting sick is not something that can be planned in advance at an employer's convenience. The ability of a sick flight attendant ("FA") to stay home is critical not only to the to the health of the employee, but also to their coworkers and the passengers they serve. ESSTA ensures that New York City FAs can make the sensible decision to stay home when sick without the fear of discipline from their employer airline.

Delta accuses defendants of presenting "a narrative that is not supported by either the Local Law's text or the facts of this case" in a "zealous attempt" to regulate transient employees. Dkt. 53 at 6. As legislative history confirms, and as evidenced by the real-life impact of the Law, ESSTA was not created and enforced for the Department to flex its "legislative overreach." Rather, it is a carefully balanced law that provides employees with protected leave, while still allowing employers to manage their businesses and hold employees accountable.

Delta advances an attenuated and speculative theory that applying ESSTA's requirements to NYC eligible FAs would present insurmountable burdens to its operations. The keystone of their argument is that compliance with the Law would prohibit the application of its

---

[1] All capitalizations and abbreviations herein have the same meanings ascribed to them in Defendants' Memorandum of Law. Dkt. 47.

progressive disciplinary program during a FA's use of protected safe and sick time.[2] Delta contends that, in the absence of disciplinary measures, FAs would excessively engage in "unreliable" behavior that would ultimately unconstitutionally burden its routes and services[3] under the Airline Deregulation Act ("ADA") and violate interstate commerce. Plaintiff fails to provide competent evidence to meet its burden.

A.    **The Law Does Not Violate the Airline Deregulation Act**

Delta speculates that compliance with the Law will lead to an indeterminate increase in sick leave use among FAs that cannot be mitigated by its existing operational methods or the Law's employer-oriented provisions. Without supporting evidence, Delta argues that this will cause delays of unknown length and frequency, in addition to an unknown number of cancellations, and will ultimately result in an untenable burden of an unknown magnitude for both Delta and its passengers. Delta claims that this chain of causation is based on its assessment of the "logical" effect of applying the Law to FAs. Delta's analysis is wrong in two significant ways. First, Second Circuit precedent does not apply the "logical effects" standard, and second, even if the Court were to apply that standard here, it should not rely on plaintiff's faulty logic, lacking in any evidentiary basis, to establish ADA preemption. Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 681 F. Supp.2d 182, 209-10 (D. Conn. 2010), aff'd 634 F.3d 206 (2d Cir. 2011) (rejecting preemption claim where theory was "simply

---

[2] Although repeatedly stating that the Law would prohibit application of its attendance-based disciplinary program on a FA's entire bank of leave, Delta is wrong. The Law applies only to the first forty hours of any type of leave in a calendar year, and any subsequent leave accrual and use remains unfettered by the Law's protections.

[3] Delta concedes that the Law has no effect on prices and rates. Dkt 53 at 8. In it's opposition brief, Delta accuses defendant of mischaracterizing its argument by stating otherwise. It asserts that Delta's pre-emption argument "is not (and has never been) predicated upon the costs associated with compliance." Id. However, Delta's complaint proves otherwise. Dkt. at ¶¶ 66, 68, and ¶ 1 of Delta's 'prayer for relief.' Regardless, defendants agree that the Law does not affect Delta's prices and rates.

too speculative to find that the impact would be significant"). At best, Delta presents a skewed logic that fails to consider mitigating aspects of the Law and its own operations.

While the First Circuit does "look[] to the logical effect that a particular scheme has on" rates, routes, or services to determine whether ADA preemption applies, see Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 21 (1st Cir. 2014), the Second Circuit has recognized that preemption analysis "in particular circumstances is difficult" and may "require extensive examination of the underlying facts." Abdu-Brisson v. Delta Air Lines, 128 F.3d 77, 81, 84 (2d Cir. 1997); Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Commn., 634 F.3d 206, 209 (2d Cir 2011); Ulysses v. AAR Aircraft Component Servs., 841 F. Supp.2d 659, 674-675 (E.D.N.Y. 2011); Sakellaridis v. Polar Air Cargo, Inc., 104 Supp. 2d 160, 163 (E.D.N.Y. 2000).

ADA preemption claims involving labor and employment laws are typically viewed as falling outside the scope of such preemption. Branche v. Airtran Airways, Inc., 342 F3d 1248 (11th Cir 2003); Abdu Brisson, 128 F.3d at 81. The purpose of the ADA is to permit more effective competition between airlines. Sakellaridis,104 F.Supp 2d at 163. State labor and employment laws have little or nothing to do with competition or efficiency between airlines, and do not touch upon the bargained for aspects of airline operations —or those issues that concern the contractual arrangement between the passenger and the airline—over which carriers compete. See Branche, 342 F.3d at 1258; Hodges v Delta Airlines, 44 F3d 334, 336 (5th Cir 1995).

This is consistent with the longstanding concept that laws that fall squarely within the traditional police powers of the state should not be disturbed lightly. Ulysses, 841 F. Supp. 2d at 679 (citing to Hawaiian Airlines v. Norris, 512 U.S. 246, 252 (1994)). Employment law is

traditionally regulated by states pursuant to their police powers. Abdu-Brisson, 128 F.3d at 81. A party arguing preemption within this field bears the considerable burden of overcoming the starting presumption that Congress did not intend to supplant state law. Id. at 83 (citing to NY State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 US 645, 655 (1995)). In accordance, an airline would "bear the burden of overcoming the initial presumption against preemption by establishing that enforcing the state and city laws would frustrate the purpose of the ADA." Id. (citations omitted).

In Abdu-Brisson, the Second Circuit evaluated the effect of a state age discrimination law on airlines within the context of ADA preemption. See id. at 80. The Court reasoned that the impact of the state law must be evaluated in terms of its actual impact or liability of exposure on an airline, and not just the potential for impact. Id. at 81. An analysis that accepted only the potential impact of a law on the airline's prices, routes and services "would sweep too many state regulatory statutes under the rug of ADA preemption." Id. In holding that the statute was not preempted, it found that permitting the full function of New York's employment law would not affect the primary concern underlying the ADA—competition between airlines. Id. at 84. Central to this analysis, the Court challenged the airline's arguments regarding the law's impact on prices and services, finding any impact too attenuated and not supported by evidence in the record. Id. at 84-85.[4] Indeed, as Abdu-Brisson illustrates, by evaluating the underlying facts, Courts within the Second Circuit seek to determine whether the

---

[4] Moreover, in response to the airline's argument of a "patchwork" of state employment laws, the Court noted that "to the extent that the scope of the protected group in age discrimination statutes may vary from jurisdiction to jurisdiction, state and local age discrimination laws are little different from generally applicable tax, environmental, or blue sky laws, which as a general matter are not preempted under the ADA." Id. at 84.

actual impact of the law frustrates the purpose of the ADA. See id.; Ulysses, 841 F. Supp.2d at 679.

It is within this framework set forth by the Second Circuit that Delta's ADA preemption claim must be evaluated. The foundation of ESSTA is to provide employees with the right to use protected safe and sick leave; it does not speak to the aspects of airline operations over which airlines compete in the open market. Branche, 342 F3d. at 1258. Here, even if Delta were to prove that compliance with the Law could actually impact routes and services, any alleged impact is too tenuous, remote, and peripheral to warrant ADA preemption. See Goodspeed Airport LLC, 634 F.3d at 206 (holding that the ADA does not preempt state and local environmental and land use statutes and regulations that impose permit requirements whose impact on air carriers, if any, are remote).

## 1. Delta's claims regarding the Law's "logical" impact on its routes and services are based on speculation.

Delta relies on speculative analysis to illustrate the Law's "logical" impact on its routes and services. In an effort to argue otherwise, Delta parrots Dr. Lee's claim that on days with unscheduled absence rates in the top 25%, Delta experienced a delay rate of 18.1% compared to an average delay rate of 13.2%. Dkt 53 at 14. Delta makes no attempt to acknowledge, much less defend, the underlying flaws defendants have identified in the regression analyses that yield those figures.  See id. at 2-10.

The most fatal flaw of the regression model is that it fails to quantify the Law's actual affect on Delta's routes and services. Dkt. 53. First, it fails to take into account the Law's limitations on an employee's use of sick leave, and instead evaluates all leave. Id. However, the Law only applies to the first forty hours of leave within a given calendar year. Admin. Code 20-913 (b)-(d), 9-22; Dkt (Holt Decl) at 4. This means that if a FA uses the first forty hours of its

leave for a weeklong vacation exceeding forty hours, the FA's use of sick time thereafter is not protected under ESSTA. Id. The regression model does not deduct a FA's leave that does not fall within this forty-hour threshold. See Dkt. 53 at 3; Dkt 41-3 (Lee's Report) at 63-65.

   Relatedly, Delta fails to quantify, let alone prove, that any amount of currently used unscheduled sick leave that is subject to discipline under Delta's performance development program ("PDP") would be protected under the Law. Pursuant to Delta's current PDP, a FA is allowed four unscheduled absences within a rolling twelve-month period before they may be, but not necessarily, subject to the first step of discipline, verbal coaching.[5] Dkt 41-5 (Zappia Decl.) at 3-4. A single absence is a 'trip' and can constitute various amounts of leave hours depending on the destination. Id. at 4. Delta, although tracking FA's leave for disciplinary purposes, has failed to specify if the amount of leave already provided without discipline would even have to be increased upon application of the Law.  It is possible, and within Delta's capabilities, to calculate whether the four allowable unscheduled absences already approach or exceed the forty-hour threshold required by the Law. Id.

   Additionally, the regression model, and Lee's interpretation of the results, assumes that Delta would have to abandon its application of it's the PDP for all of a FA's banked paid time off.[6] Dkt. 41-3 (Lee's Report) at ¶ 54.[7] This grossly misstates not only the Law's

---

[5] Historically, Delta FA's were given three unscheduled absences within a twelve-month period. Dkt. 37 (Zappia Decl.) at 3-4. That threshold was increased from three to four unscheduled absences before a FA may, but not necessarily, receive verbal coaching. Id. This change in policy does not align with Delta's narrative that an increase in unscheduled sick leave for FA would result in unmitigated operational delays, reduced routes, and fundamental changes in Delta's business structure. Id. Further, Delta has presented no evidence that this unilateral change in their sick leave policy impacted their operations. Id.

[6] Indeed, Dr. Lee's interpretation and regression analysis is predicated on the misconception that the Law would apply to all of an employee's banked leave.  Dr. Lee states that "if it were unlawful for Delta to enforce its reliability policies to hold FAs accountable for repeated unscheduled absences, then Delta would have no choice but to abandon the "Performance Development" system that has been in place for many years to ensure that FAs take reasonable measures to use PPT legitimately and to provide the airline with sufficient notice when they fall ill so

requirements, but fundamentally changes the analysis of its potential impact. At best, the Delta regression model demonstrates Delta's flight delays as if it was operating continuously in the "top 25% of worst sick days." Id. at 63-64. There is no connection between this apparently arbitrary percentage that Dr. Lee chose and the actual effects of the Law. See id.

To evade this issue, Delta also repeatedly claims that compliance with the Law would prohibit it from applying any aspect of its PDP to a FA's full PTO bank. Although this is a convenient way to avoid evaluating the mitigating impact of the Law's employer-based balances, it distorts and ultimately misrepresents the Law's intent to provide employees with protected leave, while still maintaining employee accountability to their employer. An employer can "take disciplinary action, up to and including termination, against an employee who uses safe time or sick time provided under [ESSTA] for purposes other than [permitted by the law]." 6 RCNY § 7-215; see also Admin. Code § 20-914(f); Dkt. 43 (Holt Decl.) at 4, ¶5. Indications that an employee might be using safe and sick time for unauthorized purposes can include, but are not limited to, a pattern of "(1) use of unscheduled safe and sick time on or adjacent to weekends, regularly scheduled days off, holidays, vacation or pay day, (2) taking scheduled safe time and sick time on days when other leave has been denied, and (3) taking safe and sick time on days when the employee is scheduled to work a shift or perform duties perceived as undesirable." 6 RCNY § 7-215; Dkt 43 (Holt Decl.).

---

that the carrier has time to find reserve FAs to cover their flights." He points out, that this interpretation of the Law, but not the actual language of the Law itself, "would have serious and harmful ramifications on Delta's ability to reliably operate its flights, and would undoubtedly lead to an increase in FA-related flight delays and cancellations, impairing its interstate transportation services and likely inconveniencing thousands of travelers each day and undermining U.S. commerce." See id.

[7] Dkt. 41-3 (Lee's Report) at 2 n.1, 10 (stating that if "Delta cannot enforce its reliability policy with respect to flight attendants who repeatedly call out expectantly, then it is my understanding that Delta would no longer be able to utilize its long-standing "performance development" system").

Under the Law, an employee can still be held responsible for abusing sick leave, such as consistently taking protected absences around a holiday. 6 RCNY § 7-215; Dkt. 43 (Holt Decl.) at 4. Indeed, this is the type of behavior that Delta suggests its FAs regularly engage in. Dkt. 41-5 (Zappia Decl.) at page 3, ¶ 10. But Delta fails to provide any data to substantiate this claimed "unreliability" of its FA workforce. In fact, considering its insistence that FAs regularly abuse leave at any given opportunity, Delta has failed to provide evidence of even a single instance in which a FA abused scheduled or unscheduled sick leave.[8]

Setting aside these overarching flawed assumptions, there are a multitude of technical problems with this regression model. Despite having access to the data, Dr. Lee's regression model uses a dependent variable (the affected variable to be measured) of total delay rate rather than Cabin Crew Shortage delay. While the Cabin Crew Shortage delay data was available and demonstrates no increase in flight delays, Dkt 41-3 (Lee Report) at 61-63, C7; Dkt 41-4 (Lee Depo.) at 150-151, Dr. Lee instead chose to look at whether there were more delays in total on days with higher amounts of FAs calling in sick—meaning—he chose a model that incorporates delays for a variety of other reasons including weather, aircraft maintenance, incoming flight delays, and traffic—rather than isolating a singular variable. Id.; Dkt 42 (Tregillis Decl.) at 10; Dkt. 42-1 (Tregillis Rebuttal Report) at 55-56.

Delta also fails to acknowledge that the regression analyses suffer from omitted variables, and a conclusion that does not logically flow from the data. Omitted variables lead to

---

[8] Jennifer Zappia, Delta's General Manager of Human Resources, avers that "[b]ecause of the disruptive impact that unscheduled absences may have on Delta's customer service and operational reliability, FAs with frequent unscheduled absences or who are found to be abusing or misusing Unscheduled PPT, may be subject to Delta's Performance Development Program." Dkt. 41-5 (Zappia Decl.) at page 3, ¶ 10. However, when asked during her deposition how often this disruptive impact has occurred, Ms. Zappia stated that she could not "give [] any frequency with any degree of certainty," and when further asked if she can recall any instances of FA abuse of PPT, she stated that she "can't think of any situations [of abused or misused PPT] off the top of [her] head." Dkt 41-8 (Zappia Dep.), page 60:4-14, 66:16-25, 67:1-6.

inaccurate and misleading outcomes and conclusions. Dkt. 42.1 (Tregillis Rebuttal Report) at 25-26. It is possible to mistakenly attribute a causal relationship between variables when there is, at most, a 'spurious correlation' or a movement between variables that seem related but are coincidental. Id. at 26. For example, the regression analysis fails to take into account the delay of an incoming flight or airplane, or plane load factors (it takes longer to load a full plane of passengers than an empty plane). These variables lead to increase delays at times that are entirely unrelated to the number of FAs that call in sick.  Id. at 59; Dkt. 42 (Tregillis Decl.) at 11.

Relatedly, correlation does not mean causation; the same factors that cause high occurrence of sickness may also cause high amounts of flight delays. Dkt. 42 (Tregillis Decl) at 11; 42-1 (Tregillis Rebuttal Report) at 59. For instance, in a pandemic or even a normal flu season, there may be an increase in flight delays not attributable to FAs calling out sick, but instead due to other complications unrelated to FA staffing. (e.g., passengers might move slower boarding a flight due to their own illness, airport operations may be delayed due to decreased staffing, or increased health screenings at the airport). See id.

### 2.   Delta's Virgin America example presents a fatally flawed analysis.

Delta argues that these claims are not speculative but substantiated by empirical evidence of the Law's impact on Virgin America's JFK base. Dkt. 53 at 10. Delta rests on the conclusion that after Virgin complied with the Law, it experienced increased delay and cancellation rates associated with cabin crew shortages, and that these disruptions contributed significantly to the closure of the JFK base. See id. In response to this conclusion, defendants' rebuttal expert, Christian Tregillis, set forth a number of flaws in Dr. Lee's analysis that Delta fails to address in its opposition. See Dkt. 42 (Tregillis Decl.) at 3-9; Dkt 42-1 (Tregillis Rebuttal Report) at 16-37. Rather than specifically addressing the deficiencies Tregillis identified, Delta

now accuses defendants of making a number of "disingenuous and red herring arguments designed to distract the Court." Dkt. 53 at 11.

To the contrary, each of these issues is problematic to Delta's overall analysis, and for reasons that are seemingly lost on Delta. First, incorrect and inaccurate data hinders proper analysis. If Dr. Lee was concerned with depicting an accurate outcome of the Law's effect on Virgin America's JFK base, it would be critical to confirm that Virgin did in fact properly implement all facets of the Law, and also to determine whether there were any outside variables that could potentially interfere with the data or lead to different conclusions.[9] Dr. Lee failed to investigate any of these issues beyond reading the Butler declaration and taking it at face value. Dkt. 41-4 (Lee Transc.) at 31-32, 48-52.[10] A plain reading of Butler's declaration not only exposes ambiguities in the resulting implementation of the Law, but also reveals that Virgin America implemented a sick leave policy that was incongruent to the Law's requirements. See Dkt. 41-7. For instance, Butler states that Virgin frontloaded FAs with a bank of forty hours without discipline in compliance with the Law, but then gave FAs an "additional nine days of sick leave under the Work Rules before receiving even a verbal warning." Id. at 5 ¶¶ 18-20. If a

---

[9] Dr. Lee uses coded and conditional language when evaluating Virgin's alleged compliance with the Law and its resulting affect. Dkt. 41-3 (Lee Report) at 12 ("It is my understanding that unlike other passenger carriers with flight attendant bases in New York City [ ] Virgin America took actions to comply with the Law with respect to its flight attendants."), 13 ("[I]t is my understanding that the dramatic increase in sick rates among Virgin America's flgith attendants not only led to a clear erosion in the carrier's operations at JFK airport, it was also a significant factor in the carrier's decision to eliminate its JFK base for flight attendants."),Instead of basing his opinions on facts, he bases it on his 'understanding.'

[10] In response to Virgin's compliance with the Law, Dr. Lee states: "well I think, again, I am not aware with every single detail of Virgin's policy, but my understanding is that the two main things that Virgin, again I'm going by what's in Mr. Butler's declaration, felt that were, where they were somewhat short of the full compliance would have been that, not using any points and also not being able to require any kind of notice," and "it appears as though this refreshes my memory that it's really this there is non-assigning of points and the front loading that constitutes [ ] primary changes" and that "[t]here may have been other changes that he doesn't describe, but those are the ones that I'm aware of." Dkt. 43-4 (Lee's Transcript) at 58, 60. Further, as evidenced by the Dr. Lee's report, all evidence of Virgin's compliance is based on the Butler Declaration. Dkt. 41-3 (Lee Report) at 12-13, 66.

day of work equaled seven hours, FAs at Virgin's JFK base received an additional sixty-three protected hours beyond what the Law required. See id. Although sick leave surpassing the forty hour threshold is allowed, the resulting Virgin example fails to provide insight to the effect of its compliance with the Law, but rather Virgin's implementation of its own sick leave policy. See id.

Additionally, the ambiguities in Butler's statements are apparent in Delta's own attempt and failure to explain the two-year lag between Virgin's changed sick leave policies and the spike in flight delays[11] at JFK. Initially, Delta adopted Dr. Lee's unsupported conclusion that it took two years for Virgin FAs to become fully familiar with and take advantage of sick leave provided by the Law. Dkt. 41-3 (Lee's Report) at 69 (providing that after "the two years that directly followed when Virgin America began complying with the Law" that "[FAs] became more fully aware of the Law and how Virgin America's compliance with the new regulations impacted them").[12] This argument found no support in the record, and contradicted Dr. Lee's own claim that FAs immediately adjust their behavior in response to policy changes and incentives.[13]

---

[11] While Delta continually refers to the Law's effect on Virgin's flight delays and cancellations, Dr. Lee never performed any statistical analysis of flight cancellations due to cabin crew shortages at Virgin's JFK base. Dkt. 42 (Tregillis Decl.) at page 8. Notably, he has not identified a two-year-later-epiphany effect on cancellations as he suggests were represented by flight delays. Still, Dr. Lee states that the increase in flight delays and cancellations after compliance with the Law was "a significant factor in Virgin America's decision to close its JFK FA crew base in November 2017." Id.

[12] In his deposition, Dr. Lee states that he does not "believe [he] has had a conversation with Jeff Butler, not that [he] can recall as [he] sit[s] here right now." Dkt. 41-4 at 49. This testimony is consistent the appendix to his direct report that only list Virgin Data, and the written declaration of Jeffrey Butler as his sources. See Dkt. 41-3 at B1-7. Dr. Lee was asked if he had done any independent research in the facts provided in the declarations, to which he answered "not that I can think of right now." Dr. Lee's testimony is consistent the sources provided as a basis for his report. See Dkt. 41-3 at B1-7.

[13] In relation to Delta's implementation of Well-Calls, or a change in policy that allows FAs to call in "well" in the middle of a rotation in which they had previously called out sick, Dr. Lee asserts that FAs immediately changed their behavior to the new policy. Id. at 71.  Dr. Lee argues that within the very same month the new employment

Now, in Delta's opposition memorandum, it explains that the two-year lag in increased delay and cancellation rates "are explained by Virgin's failed attempt to provide alternative staffing." Dkt. 53 at page 12. This argument is also unsupported by the record, as the two-year delay was never mentioned in the Butler declaration. See Dkt. 41-7 (Butler Decl.) at 5-6. Indeed, the data from this time period illustrates that Virgin America's reserve FA staffing model worked as expected by absorbing FA absences—even though FAs were given over double the amount of protected sick leave required by the Law.[14]

Further, Delta claims that the most impactful area of the Law would be the notice requirement; for unforeseeable uses of sick time, such as a sudden illness, employees need only provide notice to their employer as soon as practicable under the circumstances. Admin. Code § 20-914(c); 6 RCNY § 7-205 (d); Dkt. 43 (Holt Decl.) at 5 ¶ 16. Delta argues that if it is unable to apply its disciplinary policies for a FA's short notice when taking protected leave, it will "logically affect Delta's ability to provide timely transportation." Dkt. 53 at 10. However, despite this assertion, Delta failed to analyze the effect of "no show/no call" flight crew absences on flight delays. See id. Indeed, Virgin CrewTrac data show, that in the two years after the

---

policy went into effect, "the frequency of well calls dropped dramatically." Id. at 72. He then generalizes that this "predictable effect" on well calls strongly suggests that if Delta were forced to comply with the Law, the policy change "would similarly incentivize FAs to be absent from work on more days than they otherwise would." Id.

[14] Dr. Lee performed a regression analysis that indicates that in the two years following compliance with the Law Virgin saw an increase in the percentage of Cabin Crew Shortage delays of 0.16% of flights out of JFK, excluding delays he estimates to be normal or unrelated to compliance with the Law. Dkt. 42 (Tregillis Decl.) at page 4-5. Dr. Lee's regression coefficient of a 0.16% increase in the probability of a Cabin Crew Shortage delay in the first two years after compliance is not statistically significant at the 95% or 99% level. Id. In other words, Dr. Lee's regression showed that in the two years after Virgin America began to comply with the Law, while Virgin experienced a 41% (first year after compliance began) and 99% (second year after compliance began) annual increase in sick time taken by FAs at JFK, there was nonetheless no statistically significant increase in Cabin Crew Flight delays at JFK during this time. Id. This suggests that Virgin America's reserve FA staffing model worked well and as expected, with sick calls covered by reserve staff in all but four instances. There was a Cabin Crew Shortage delay only four times in the first two years of compliance with the Law, and no cancellations related to compliance with the Law. Id.

airline began complying with the Law, there were only six instances in which FAs' absences were coded as late with less than two hours of notice. Dkt. 42 (Tregillis Decl.) at 9; 42-1 (Tregillis Rebuttal Report) at 52. As a result, there does not appear to be a significant amount of leave taken with short notice—and further, it is unclear how much of this short notice leave was protected under ESSTA. See id. Even evaluating the additional six-month period after Virgin announced the closure of the JFK FA base, there were only twenty-seven instances of no-call FA absences in 2.6 years with only five cabin crew shortage flight delays out of a total of 303 flights. Id. This is approximately 1.65% of flights that experienced a Cabin Crew Shortage delay. Id. In other words, even with no-call FA absences, Virgin America was able to cover staff shortages with reserves 98% of the time. Id.

### 3. Air Transp. Assn. of Am. v Washington Dept. of Labor & Indus. provides an accurate analysis of the Law's impact on Delta's operations.

In Washington Dept. of Labor & Indus., the Court evaluated an almost identical evidentiary record in a case brought by Air Transportation Association of America[15] to strike down a sick leave law in Washington State similar to that at issue here. 410 F. Supp. 3d 1162 (WD Wash 2019), appeal filed, 19-cv-35937 (9th Cir. Nov. 8, 2019). There, the airline industry presented the court with the exact replication of Dr. Lee's analysis of ESSTA on Virgin America's JFK base.[16] Id. at 1175-77. The Court rejected the airline's theory that FA absences caused the closure of Virgin's JFK base, and found that the airlines' reliance on the Virgin example was misplaced. Id. at 1176. The court also highlighted a significant consideration that

---

[15] Airlines for American is a trade and lobbyist group composed of major North American airlines. See id. Delta is among its member airlines. Id.

[16] In Dr. Lee's deposition in this case, he states that he relied on the same sources for his Virgin America regression model and resulting analysis. Dkt. 41-4 (Lee Transcript) at 51-54.

Dr. Lee overlooked; namely, that Virgin's merger with Alaska Airlines, changes in staffing, and subsequent announcement of the JFK base's closure coincided with Virgin's spike in flight delays and cancellations. The decision states in part:

> However, for the first two years after Virgin began complying with ESTA, cabin crew delays only increased by .16 percentage points, an amount that is almost irrelevant compared to the Airlines' overall delay rates of 15 to 20 percent. During the final seven months before the JFK base's closure, cabin crew delays suddenly increased by 1.2 percentage points, which the Airlines' expert speculatively attributes to flight crew finally becoming "fully aware" of ESTA's terms. But other major changes at Virgin around that time, including Alaska's decision to cut reserve pools after the Virgin acquisition and announcements related to closing the JFK base, cast serious doubt on the Airlines' causation theory.

See id. (internal citations omitted). Dr. Lee's conclusion that the spike in delays was caused by FA absences based on the Law illustrates the hazards of attributing the movement of a variable to an unassociated cause.

Further, Dr. Lee attributes Virgin's JFK base closure on a spike of flight delays and cancellations that appear to have had practically no effect on operations. Dkt. 42 (Tregillis Decl.) at 5. Indeed, the actual amount of delays and cancellations presented an insignificant increase. Id. The more likely explanation is that Virgin's JFK closure was due to economic reasons having nothing to do with sick leave laws. Washington Dept. of Labor & Indus, 410 F. Supp. 3d at 1176. The Washington court explained:

> It also seems likely that the JFK base was closed because it was too small to be profitable, not because of ESTA. Tregillis Report at 41-42; Mann Report at 32-34. Notably, there are no indications of other airlines experiencing closures or other operational impacts because of sick leave laws. Moses Dep., Dkt. # 88, Ex. 7, at 72-73 (American's LAX base has expanded despite LA's sick leave law); Am. Airlines Dep. at 24, 41-42 (sick leave laws do not affect American's plans for network expansion); Shaw Dep., Dkt. # 88, Ex. 15, at 38, 74-75 (Southwest's operations have been unaffected by Oakland, LA, and Baltimore's sick leave laws); Southwest Dep.,

> Dkt. # 91 at 28-31 (Southwest's Baltimore, Atlanta, LA, and
> Oakland bases have grown despite sick leave laws); United Dep.,
> Dkt. # 88, Ex. 20, at 44-45 (United attributes no base closures,
> route changes, or fair changes to local sick leave laws); Alaska
> Dep., Dkt. # 88, Ex. 13, at 79-80 (Alaska's operations have not
> been impacted by complying with Washington's Family Care Act).

Id. The Court emphasized that sick leave laws had been implemented in several jurisdictions

without any negative impact. See id.

Finally, Delta argues that it is not obligated to evaluate the "practical effects of

the Law on cost and satisfaction of passengers" in its preemption analysis. Dkt 53 at 11. Again,

Delta misses the point, and mischaracterizes defendants' argument. Delta asserts that compliance

with the Law will cause delays and cancelations of unknown frequency and length that will have

a disastrous effect on services and routes—but again, concedes that it will have no effect on

price. Over the course of this litigation, Delta has continuously argued that it operates in a

customer-based service industry and its reputation of on-time and efficient service is critical to

that operation, and that any additional delays or cancellations of flights would "be a huge

inconvenience to our customer[s]." Dkt. 41-8 (Zappia Dep.) at 57, 6:18[17]; Dkt 53, 5, 15,; Dkt 34-

1 (Lee Report) at C-5, 80. Now, facing a record absent any evidence as to the effects of the Law

on customer satisfaction and the services it provides, Delta attempts to back away from these

statements.

In its normal course of business, Delta operates with an average of a fifteen

percent delay of all flights. Dkt. 42-1 (Tregillis Rebuttal Report) at 22; Dkt. 41-3 (Lee Report) at

63; see also Dkt. 41-4 (Lee Transcript) at 168 (stating that "if you can reach 85% [on time rate]

---

[17] When asked how often planes are delayed or cancelled due to the tardiness or absence of a flight attendant, Ms. Zappia testified that she "doesn't have access to that data," and is simply "aware of instances in which it's occurred in the past." Id.

you're good). Even if Delta provided evidence that the Law caused additional delays and cancellations, it would need to prove a significant impact on services and routes in order to meet the preemption standard contemplated by the ADA. See Morales 504 U.S. at 383–84, 388; see also Tobin v Fed. Express Corp., 775 F.3d 448, 454 (1st Cir 2014) (stating that the "connection…cannot be *de minimis*"). "[S]ome state actions may affect airline [prices, routes, or services] in too tenuous, remote, or peripheral a manner to have pre-emptive effect." Morales, 504 U.S. at 390 (internal quotations omitted); see also, e.g., See Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco, 992 F. Supp. 1149, 1183 (N.D. Cal. 1998) ("If any string of contingencies is sufficient to establish a connection with price, route or service, there will be no end to ADA preemption."); Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251, 260 (2013); ("[T]he breadth of the words 'related to' does not mean the sky is the limit[.]").

This necessarily requires that the practical effects of the Law would need to be evaluated to prove an impact beyond what is considered acceptable or expected in the normal course of business. See id. Indeed, in order to argue a 'cascade of effects' flowing from delays and cancellations, it must follow that Delta would need to show that an impact would be felt beyond a single flight; customers would miss connecting flights, airplanes would be backlogged at gates, and as they claim, there would be an inconvenience to customers.[18] While providing plentiful dire warnings of the potential for these effects, no evidence is provided to lend substance to the speculations.

---

[18] Dr. Lee admits that he did not evaluate the "cascade of effects" or "downstream disruptions" that he argues would flow from ESSTA. Dkt. 41-4 (Lee Transc.) at 123. When asked what level of increase in downstream ripple affect does Delta anticipate from compliance with ESTA, Dr. Lee answered that "[a]s far as [he knows], [Delta] hasn't estimated that. Id.  Following up, when asked how often these downstream disruptions occur from a flight cancellation, Dr. Lee answered: " I mean, I would think they happen very frequently. I haven't, again, I made no attempt to quantify this because I didn't think it was a particularly controversial topic. I would happy to investigate, but I haven't undertaken that analysis at this point." Id.

In connection with this point, Delta argues that it cannot "be expected to implement policy changes that would severely impact its routes and services, just so that it can gather empirical evidence that the Defendants demand here." Dkt. 53 at page 12. But Delta has recently, and unilaterally, liberalized its policies to increase the amount of leave that is protected from discipline, highlighting that it <u>can</u> implement such policy changes without any impact to its routes and services. Historically, Delta FAs were given three unscheduled absences within a twelve-month period. Dkt. 37 (Zappia Decl.) at 3-4. That threshold was increased from three to four unscheduled absences before a FA may, but not necessarily, receive verbal coaching. <u>Id.</u> Delta has presented no evidence that this policy change "severely impacted its routes and services." <u>Id.</u>

In response to Washington's preemption analysis, Delta attempts to distinguish the current case by stating that, here, its "preemption claim is not based upon a 'generic' argument about increased labor or compliance cost," but is instead founded on the logical effects of the Law's impact including increased passenger delays and cancelations. Dkt. 53 at 29. Although in the instant case Delta does concede that the Law will not affect rates or prices, they cannot specify how the legal analysis here differs from that which they presented in Washington. An examination of the record reveals that, in addition to a more robust evidentiary record provided by Air Transportation for America, the plaintiffs there rested on the same flawed analysis of the Law's affect on Virgin, and a conclusory, unsupported declaration by Jeff Butler.

Delta contends that <u>Washington Dept. of Labor & Indus</u>, improperly applied Supreme Court precedent to limit the scope of ADA preemption, Dkt. 53 at 9; <u>see</u> 410 F. Supp. 3d at 1176, and that, instead, <u>Northwest, Inc. v. Ginsberg</u> provides the binding standard for evaluating the present preemption claim. 572 U.S. 273 (2014). Plaintiff's assessment of

Ginsberg's significance in the current analysis is misplaced. See Dkt. 53 at 7-8. The Supreme Court has expressly declined to create a bright line rule as to the ADA's preemptive reach—and has not directly addressed the issue at hand—whether a local sick leave law applied to FAs falls within ADA preemption. See Ginsberg, 72 U.S. at 278, 283; Ulysses, 841 F.Supp. 2d at 668; American Airlines, Inc. v Wolens, 513 U.S. 219, 229 n. 5 (1995) (holding that in line with the ADA's overarching purpose, states may not seek to impose their own polices on competition or regulation of an aircraft); Morales v TWA, 504 US 374 (1992) (holding that the ADA does not preempt state statutes that affect rates, routes, or services in a "too tenuous, remote or peripheral a manner").  Instead, ADA preemption claims are evaluated on a case-by-case basis, with each decision offering insight into the interpretation, scope, and application of preemption provisions within a certain factual and legal context. See id.; Ulysses, 841 F. Supp.2d at 666-67 (E.D.N.Y. 2011).

Ginsberg is distinguishable both legally and factually from the present case and, as such, provides limited guidance. See generally Ginsberg, 572 U.S. 273. In Ginsberg, the Court considered whether the ADA preempted state law claims for breach of implied covenant and fair dealing in the context of a frequent flier program. Id. at 276.[19] The Court narrowly held that the ADA preempts a state law claim for breach of the implied covenant of good faith and fair dealing if it seeks to enlarge a contractual obligation voluntarily adopted by the parties. Id.[20]

---

[19] There, a frequent flyer program member alleged that an airline breached the implied covenant of good faith and fair dealing when it terminated his program membership for abuse. Id. The frequent flier program was inextricably linked to prices and services; the program awarded mileage credits that could be redeemed for tickets and upgrades, and allowed members to access flights and services. See id.

[20] Moreover, even within this narrow holding, the Court suggested that had the facts been altered, preemption might not apply. Id. at 285. The respondent, a frequent flyer program member, argued that frequent flyer programs have fundamentally changed providing no direct link to an airlines, prices, routes, and services. See id. Specifically, he argued that most miles are now earned and spent without consuming any airline services. Id. The Court commented

The facts in Ginsberg and the instant case are decidedly different—here the parties do not have a contractual relationship, and the law in question does not directly relate to prices, routes, and services of an airline. See id. As such, Ginsberg departs from the current case in key ways. First, it does not implicate a state's traditional police power to regulate the public health, safety, and employment of its citizens. Abdu Brisson, 128 F.3d at 83; Travelers Ins. Co., 514 US at 655. The Court did not apply a presumption against preemption to its analysis as required for cases touching on traditional local police powers. See Ginsberg, 572 US at 276; Travelers Ins. Co., 514 US at 655. Second, the frequent flyer program has a direct, express relation to the prices and routes of the airline and is supported by evidence of the frequent flyer program's direct link to prices and routes. Id. As set forth above, the same cannot be said of the Law's impact on Delta's routes and services.

**B.     The Law Does Not Violate the Dormant Commerce Clause.**

As illustrated above, Delta relies on an attenuated and speculative analysis to prove that compliance with the Law will impact its routes and services. This level of reasoning extends to Delta's analysis of the alleged unconstitutional burdens of the Law on interstate commerce. Here, Delta relies on inaccurate representations of the Law, and empty hypotheticals that are not grounded in factual evidence about the Law's impact on its national operations.

Preliminarily, Delta presents an exaggerated landscape of congressional control of interstate commerce.  Congressional control of interstate commerce was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." Huron

---

that this alleged change could have an impact in future cases, but ultimately the respondent earned and spent his frequent flyer miles exclusively on flights and upgrades—and therefore related to prices, and services. Id.

Portland Cement Co. v. City of Detroit, Mich., 362 U.S. 440, 443-44 (1960). Laws that are not protectionist in nature but are instead premised on general police power—like the Law—are presumptively valid. See Maine v. Taylor, 477 U.S. 131, 138 (1986). And because employment law and "consumer protection [are] traditionally subject to state regulation, [w]e should be particularly hesitant to interfere with the [State's] efforts under the guise of the Commerce Clause." SPGGC, LLC v. Blumenthal, 505 F.3d 183, 194 (2d Cir. 2007) (internal quotations omitted); see also De Canas v. Bica, 424 U.S. 351, 356 (1976) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum wage and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples.").

Delta argues that the field of aviation is unique in that it requires uniform national regulation. Dkt 31 at 30; Dkt 53 at 24 (citing to City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633-34 (1973)). However, it fails to support this proposition with cases that address a law premised on a state's general police power to regulate labor rights for airline workers. See id.; Dkt. 31 at page 30 (citing to Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 527 (1959) (holding that State regulation of mudguards on truck and trailers violates the Commerce Clause); Northwest Airlines, Inc. v. State of Minnesota, 322 U.S. 292, 302 (1944) (holding that the Commerce Clause does not bar the imposition of personal property tax on airplanes operating interstate)).

Indeed, several Courts have held that local regulation of labor rights for airline workers is permissible. Washington Dept. of Labor & Indus, 410 F. Supp. 3d at 1171-72 (WD Wash 2019) (citing to Hirst v. Skywest, Inc., 910 F.3d 961, 967 (7th Cir. 2018) (holding that the states possess authority to regulate the labor of its own citizens in terms of minimum wage

requirements)); <u>Bernstein v. Virgin Am.</u>, Inc., 227 F. Supp. 3d 1049, 1069 (N.D. Cal. 2017).[21] As such, there is no legal requirement for uniformity regarding the regulation of labor rights for airline workers. <u>Id.</u>

Delta argues that because of the inherent nature of the airline industry, the Law—and by logical extension any state or local law—that regulates labor rights for airline workers will necessarily violate the Dormant Commerce Clause both in its extraterritorial reach, and burden on interstate commerce. For the reasons set forth below, this argument has no merit.

### 1.   The Local Law does not regulate extraterritorially.

Delta contends that the Law has an impermissible extraterritorial reach, contributes to a 'patchwork' of inconsistent and irreconcilable statutory provisions, and forces airlines to reform system-wide leave policies. Dkt 52, at 27. To illustrate these issues, Delta sets forth a hypothetical example of a Massachusetts-based FA, who is covered under the Law, and takes an unscheduled absence for a flight originating in Los Angeles to New York City. Dkt. 53 at page 28. The Los Angeles' Municipal Code allows employers to require employees to provide reasonable documentation of an absence. In contrast, the Law allows documentation for absences of three or more consecutive workdays. <u>Id.</u>; Los Angeles Mun. Code, ch. XVIII, art. 7, § 187.04 (G); Admin. Code § 20-914. Delta argues that not only is this legislation inconsistent, but

---

[21] In <u>Washington Dept. of Labor & Indus,</u> the Court cites the savings clause of the Family Medical Leave Act to support the holding that Congress did not intend uniformity in the regulation of labor rights for airline employees. 410 F. Supp. 3d at 1172.  The savings clause of the FMLA provides, "[n]othing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act." <u>Id.</u>  (quoting 29 U.S.C. § 2651(b)).  The Court found that while the "FMLA does not regulate the airline industry specifically, it also does not exempt it, suggesting that Congress generally approves of local laws boosting labor protections for airline employees." <u>Id.</u> (citing to <u>Pac. Merchant Shipping Assn. v Goldstene,</u> 639 F3d 1154 (9th Cir 2011)).

further, the Law impermissibly regulates its conduct extraterritorially by prohibiting Delta from asking the FA for documentation in LA.

These arguments are unpersuasive. A state statute does not violate the extraterritorial aspect of the Dormant Commerce Clause if the application of the law does not take place wholly outside of the state, does not directly control commerce outside of the state, and the state statute does not create inconsistent legislation with other jurisdictions. See Healy v Beer Inst., 491 U.S. 324, 336 (1989). Here, the challenged enforcement actions under the Law would have a sufficient nexus to New York City. In order to qualify for protected leave, the FA must be based[22] at a NYC airport or meet the 80-hour work threshold within NYC. See Administrative Code § 20-912 (statutory definition of "employee"); Dkt. 43 (Holt Decl.) at 7 ¶ 24; Dkt. (Enforcement Policy) at page 2. Additionally, an airline needs only to allow an FA to use protected sick leave "for any flight originating or ending in New York City." Dkt 43 (Holt Decl.) at 8 ¶ 29.

The mere fact that the Law would impact the employer-employee relationship for work performed out of state does not by itself substantiate a Commerce Clause violation, nor does the fact that it may require the airline to modify some of its operational practices outside the city to accommodate this impact.  See Mendis v Schneider Nat'l Carriers Inc., 2016 U.S. Dist. LEXIS 156695, at 17 (holding that the dormant Commerce Clause does not exempt a trucking company from complying with Washington State's law mandating rest breaks to a truck driver, including for work performed outside the state); Bostain v. Food Express, Inc., 153 P.3d 846, 856 (Wash. 2007) (finding that the state's law requiring employers to pay overtime payments to

---

[22] A FA base is an airport from which an airline starts and ends flight crew work assignments. Dkt. 36 (Oakes-Cook Decl.) at 2.

their in-state employees lawfully applied to all work performed by covered employees).

Accordingly, compliance with the Law would require Delta to provide mandated sick leave to

FAs that have a sufficient nexus to NYC—but would not, as plaintiff suggests, require Delta to

make broad changes to its nationwide reliability policies for FAs based outside the City.

Nevertheless, Delta emphasizes that there are thirty-five different state and

municipal sick leave laws that allegedly impose inconsistent and irreconcilable statutory

provisions.[23] Dkt. 53 at page 27. Delta argues that each law has a unique accrual, use, discipline,

and notice provision, and it is possible that a FA could qualify for protected leave in two

different jurisdictions with inconsistent sick leave laws. Dkt. 53 at 27. However, within the

meaning ascribed by Dormant Commerce Clause, in order for a law to be unconstitutionally

inconsistent, it cannot merely create additional obligations, but must have irreconcilable

obligations. Air Transp. Assn. of Am., 410 F Supp 3d at 1174 (citing Instructional Sys. v

Computer Curriculum Corp., 35 F3d 813 (3d Cir 1994); see also Freedom Holdings, Inc. v

Spitzer, 357 F3d 205, 221 (2d Cir. 2004). In addition to its failure to provide evidence that the

Law creates irreconcilable obligations, Delta fails to provide any specific examples or statistics

as to how many, if any, FAs could be subject to overlapping sick leave laws.[24]

---

[23] Delta exhaustively lists jurisdictions that impose sick leave laws, but fails to present any evidence of wide spread conflict between the Law and other sick leave laws.

[24] In Washington Dept. of Labor & Indus., the Court contemplated that the most probable source of overlap in sick leave laws would be caused by protections based solely on the number of hours worked in the jurisdiction. 410 F.Supp.3d at 1174. It stated that while it is conceivable that a Washington-based FA could frequently fly to such a jurisdiction and meet the hour requirement threshold to be subject to both sick leave laws, sick leave laws' requirements integrate rather than conflict. Id. For instance, Washington protected sick leave covers an employee's absence to care for an ill sibling or grandparent, while Massachusetts's law does not. Id. These obligations do not conflict in a way that makes it impossible for an airline to comply with them both. Id.  The Court also noted that, although this scenario was conceivable, airlines provided no data on whether such fringe cases actually exist, and if so, the frequency in which they do. Id.

**2.   Delta fails to prove the Law will substantially burden interstate commerce.**

Delta baselessly claims that compliance with the Law will unconstitutionally burden interstate commerce by creating a significant administrative burden and impeding the movement of passengers.   Dkt 53 at 26. Dr. Lee states that "[i]f Delta and the other U.S. passenger airlines were compelled to comply with the [Law] with respect to their flight attendants, the airlines would experience increased use of sick leave among flight attendants which, in turn, would lead to more flight delays and cancellations, thereby impacting the airlines' services, disrupting passengers, and interfering with U.S. commerce."[25]   However, Dr. Lee "has made no attempt to quantify that . . ." because this analysis would be from the "quantification of the overall impact of ESSTA on Delta, and [he] hasn't done that." Dkt. 41-4 (Lee Transc.) at 124. Delta has not met its burden to establish that the Law has a significant impact on interstate commerce.

Delta asserts that the "Law will place significant impermissible administrative burdens on Delta by requiring it to track and monitor the movement of its approximately 22,000 FAs in real time, as they travel across the country, state, and city lines in order to determine what paid sick leave laws apply when and to whom." Dkt 53 at 31. Delta fails to quantify how it could be administratively burdened beyond cursorily stating that it would need to change nationwide operations to conform to the local Law, and as a result it would seriously impede free flow of commerce. Id. Even if Delta had presented evidence that it would be necessary to change its operations in response to the Law—which it has failed to do—a change in operations in response

---

[25] Dr. Lee basis this statement on several economic studies that quantify the cost of flight delays generally on the U.S. economy. Dkt. 41-3 at 46 n. 102. Dr. Lee fails to cite to authority to support that the Law would lead to increased use of sick leave, sick leave would lead to flight delays, flight delays would disrupt passengers, and as an affect, it will interfere with U.S. commerce. Id.

to a Law does not constitute a dormant Commerce Clause violation. The dormant Commerce Clause does not protect the "particular structure or method of operation in a retail market." Exxon Corp. v Governor of Maryland, 437 US 117, 127 (1978). As such, it does not protect Delta's method of operation, nor guarantee Delta's preferred method of operation in the airline industry. See id. Delta's claim that it must change its operations, either on the local or national level, is irrelevant to the current analysis.

Further, Plaintiff exaggerates the level of detail needed to track each FA as the Law does not require real time tracking of a FA's precise location. Even so, Delta has indicated that it already has the ability to track FAs in sufficient detail to obtain this information. Dr. Lee provides raw data and analysis of the amount of duty time FAs spent on the ground, in air space, and time spent in or over geographic regions.[26] Dkt. 41.3 (Lee Report) at 26-34. As an illustration of the level of specificity with which Delta is able to track its FA, Dr. Lee provides an example of a FA's location from New York to Seattle pinpointed by the hour, minute and second, as they fly across the country. Id. at 28.  As this analysis suggests, it is already within Delta's operational capability to track its FAs, and any additional operations burden it now claims is speculative.

Finally, Delta argues that the Law's burden on interstate commerce is clearly excessive to the local benefit, and therefore it cannot withstand the Pike analysis. See Pike v. Bruce Church Inc., 397 U.S. 137, 142 (1970). Under Pike, courts uphold nondiscriminatory statutes that have incidental effects on interstate commerce unless the burden on such commerce

---

[26] For instance, Dr. Lee provides a chart that illustrates the amount and percentage of FA duty time spent in or over geographic regions for a specific flight from New York City to Washington. Dr. Lee is able to break down the FA's duty time by the hour, minute, and second, that the FA was on the ground in NYC, in the air, in each state en route and including Washington State, as well as ground time upon arrival in Washington. Dkt. 41.3 (Lee Report) at 29.

is "clearly excessive" to the local benefit. See id. Delta has not shown a substantial burden on interstate commerce, let alone a "clearly excessive" one.[27] See supra Part A. Therefore, as Delta is unable to meet its burden, the Pike analysis must stop here. See Pike, 397 U.S. at 142. However, even if it could show a substantial burden, the important policy benefits of the Law outweighs any putative burden on interstate commerce. See id.

Delta does not meaningfully dispute the public health benefits of the Law. Presumably, Delta agrees that a FA should not fly while sick. The right to protected sick leave is especially important in public-facing industries and the transportation industry in which the risk for exposure to and spread of communicable disease, like COVID-19, is significant. There are few occupations that exemplify the individual and public health concerns underlying sick leave as clearly as FAs. Indeed, FAs by the nature of their work are in a unique position to not only be exposed to, but broadly transmit illness and disease. SOF at ¶ 52.  Due to FA's high degree of personal contact with passengers, studies have estimated that a sick FA is 6.6 times more likely than a sick passenger to infect someone else on a flight. These stark health consequences are complicated further by employment policies that discipline FAs for calling out sick. By ensuring that airlines provide sufficient sick leave to FAs that work out of New York, the Law ensures that covered FAs flying into or out of New York City never have to risk their own safety, or put passengers, New York City residents and visitors, at risk of infection due to fear of retribution from their employer or lost income.[28]

---

[27] Delta concedes that the Law has no impact on its prices or rates. Dkt. 53

[28] Plaintiff attempts to discount the Law's benefits by arguing that it exempts other classes of healthcare and transportation workers. Dkt. 53 at 28. It further argues that these exemptions undercut any purported benefits and make it clear that it is not essential for Delta FAs to fall within its statutory coverage. Id. First, Delta mischaracterizes the scope of the exemptions it describes, which are in fact extremely narrow. See N.Y.C. Admin Code §§ 20-912 and 20-913(f) (exempting certain medical professionals who are licensed by the New York state education department and also meet the other criteria required to meet the Law's definition of "hourly professional

C.      **The Law is Not Unconstitutionally Vague.**

As evinced in its opposition, Delta reads the Law and its guidance in an unnaturally strained manner in an attempt to demonstrate the Law's vagueness. Dkt 53 at 38-42. Plaintiff points to two main sources of ambiguity; in the usage of the words "flight," "originating," "end," "take off," "landing" in defendants' enforcement guidelines, and the added word of 'minimum' in defendants' memorandum of Law.

First, it argues that the use of the word 'flight' is ambiguous in the enforcement guidelines when referencing a FA's allowable use of protected leave. Id. at 38. The enforcement policy states that "a covered flight crew employee may use accrued safe/sick time . . . for any flight originating or ending in New York City." Dkt 33-2 (Enforcement Policy). The ambiguity, Delta alleges, is whether the flight refers to an individual flight segment or a flight rotation that originates or ends in NYC. Delta's confusion is allegedly confounded by the interchangeable use of the word "originate" and "end" and at times "take off" and "land."

This provision of the enforcement guidelines uses the word 'flight' in a way that is consistent with Delta's own definition. Indeed, when referring to anything other than the single leg of a flight, Delta uses other descriptors such as "pairing," "trip," or "rotation." Dkt. 33-7 at 4073 (defining pairing as "[o]ne or more duty periods containing a series of one or more flight legs. Also can be called a rotation, trip, or pattern."). Additionally, it provides flight time as "the greater of actual or scheduled block time on a flight leg," a flight leg being "the operation of an aircraft with a takeoff from one city to another city." Id. at 4068. Delta's argument that the

_____

employee"); Paid Safe and Sick Leave Law FAQs (exempting drivers who pass through New York City without stopping to make deliveries or pickups). Also, this argument serves to improperly second-guess the judgment of the lawmakers. See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 92 (1987).

absence of the word "leg" in addition to the word "flight" makes the law incomprehensible is unavailing.

Delta also argues that the words "take off," "land," originate" and "ends" were used interchangeably in the enforcement policy causing confusion. These words are used interchangeably as they align in meaning in the context they are provided in the enforcement policy. Dkt. 33-2 (Enforcement Policy).  Indeed, Delta provides no alternative meaning in which these words were misconstrued.

When referring to a FA's acceptable use of protected leave, Delta contrasts that the enforcement guidelines state that "[a] covered employee may use accrued safe/sick time hours . . . for any flight originating or ending in New York City," while in defendants' Memorandum of Law, Dkt. 47 at 18, state that the Local Law applies "at a minimum" to any flight originating or ending in NYC.  In context, the meaning of defendants' statement is clear. The full sentence reads: "The enforcement policy requires employers to allow employees to use protected leave for, at minimum, any flight originating or ending in New York City." An employer has a minimum obligation to allow an employee to use the leave in the manner specified. If the employer wishes, it may provide protected leave that extends beyond the minimum requirements of the Law.

In order to succeed on a vagueness challenge, a plaintiff must do more than show that the provision of law in question employs "an imprecise but comprehensible normative standard."  United States v. Schneiderman, 968 F.2d 1564, 1567 (2d Cir. 1992), cert. denied, 507 U.S. 921 (1993).  The due process clause does not require that a law be drafted with such specificity that it leaves no room for interpretation, nor is it void for vagueness merely because situations may exist in which it should not be applied.  Grayned v City of Rockford, 408 U.S.

104, 108-110 (1972). The Law and its implementing regulations offer sufficient clarity such that a "person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited." See id. at 108.

Delta's claim falls well short of the high standard for striking down economic regulations as unconstitutionally vague.

## **CONCLUSION**

For the reasons set forth above, plaintiff's motion for summary judgment should be denied, and defendants' motion for summary judgment should be granted in its entirety.

Dated:        New York, New York
              April 30, 2020

JAMES E. JOHNSON
Corporation Counsel of
the City of New York
Attorney for Defendants
100 Church St.
New York, New York 10007
Email: alalic@law.nyc.gov
Tel: (212) 356-2215
Fax: (212) 356-2019

By:        _____/s/_____
           Annette M. Lalic
           Assistant Corporation Counsel